D. Stephen MENZIES,
Petitioner-Appellant,

v.

Raymond K. PROCUNIER, Director,
Texas Department of Corrections,
Respondent-Appellee.

No. 83–2365.

United States Court of Appeals,
Fifth Circuit.

Oct. 9, 1984.

**19.** *Id.*

Michael A. Maness, Houston, Tex., for petitioner-appellant.

Jim Mattox, Atty. Gen. of Tex., Paula Offenhauser, Asst. Atty. Gen. of Tex., Austin, Tex., for respondent-appellee.

Before GEE and POLITZ, Circuit Judges, and BELEW *, District Judge.

BELEW, District Judge:

Petitioner, D. Stephen Menzies, appeals the district court's denial of his habeas corpus petition challenging his state conviction for aggravated rape and thirty-year prison sentence. The issue on appeal is whether Petitioner received a fair trial within the meaning of the due process clause of the fourteenth amendment.

### Background

In April, 1975, Petitioner was tried before a jury in the 177th District Court of Harris County, Texas, for the alleged offense of aggravated rape. The state's case was based almost entirely on the testimony of the complainant, a cocktail waitress, who alleged that Petitioner, a customer of the bar where she worked, forced her into his automobile at approximately 3:30 a.m. on August 17, 1974, drove her to another location, then raped her, releasing her near her home approximately three hours later.

Petitioner, who was represented by retained counsel at trial, maintained that he had merely given the complainant a ride home at her request, after which he stopped at a restaurant for a cup of coffee and then went home, arriving there before 4:00 a.m. Petitioner also testified that following this incident the complainant and an unidentified male had telephoned him and attempted to extort money from him by threatening to file a spurious charge of rape against him. The jury returned a verdict of guilty and assessed a thirty-year sentence.

The Texas Court of Criminal Appeals affirmed this conviction and sentence in November, 1978, in an unpublished opinion. Petitioner then filed a *pro se* federal habeas corpus application in the Southern District of Texas, alleging in substance the same claim made by his court-appointed appellate attorney before the Court of Criminal Appeals—that is, that the accusation by a defense witness during his trial that his trial counsel had suborned perjury created a "conflict of interest" invalidating his conviction. That application was denied in November, 1979, as was a certificate of probable cause to appeal.

Petitioner then retained counsel, who applied both to this Court and to the Supreme Court of the United States for a certificate of probable cause based upon reformulated constitutional claims arising from essentially the same operative facts. Both this Court and the Supreme Court of the United States denied the certificate.

Petitioner's counsel then filed a state post-conviction application for the writ of habeas corpus in the court of conviction in

---

* District Judge of the Northern District of Texas, sitting by designation.

March, 1981, alleging the factual and legal grounds for relief asserted in this appeal. The state post-conviction application was forwarded by the trial court to the Court of Criminal Appeals of Texas in May, 1981, and the Court thereafter denied relief without written opinion in September, 1981.

Having thus exhausted state remedies, Petitioner's counsel filed the present federal habeas corpus proceeding in the Southern District of Texas in October, 1981. It was denied on the merits without a hearing in May, 1983, after the Court denied the state's motion to dismiss the proceedings for alleged abuse of the writ of habeas corpus. We granted a certificate of probable cause and now reverse.

### The Alleged Intimidation of the Complainant Claim

During the prosecution's direct examination of the complainant the following transpired:

Q. (By Mr. Graham) [counsel for the state] Miss Stone, in the the middle part of July—excuse me. In the latter part of November, 1974, did you have an occasion to come in contact with certain people who harmed you physically that was related to this case?

MR. MOORE: [counsel for the Defendant] Same objection on the grounds that it's not material to any issue of this lawsuit. It is involving an extraneous offense which is obviously not connected with my client and I object to it on those grounds.

THE COURT: Overruled.

Q. (By Mr. Graham) "Yes" or "No."?

A. Yes.

Q. Will you describe to the jury how that occurred, just what you saw and what was done to you?

A. Well, I had gone out, it was around noon, to get the mail, and there was no one. I mean, I didn't notice anyone around the house. I was in the house five minutes and the doorbell rang. When I opened the door, there were three men at the door.

MR. MOORE: We'll renew our objection as to any of this line of testimony as some sort of extraneous offense not involving the defendant and not connected or material to any issue of the crime charged and as prejudicial and inflammatory and suggestive as to any involvement or proposed involvement of my client.

MR. GRAHAM: It is material and we would show it in just a few more questions.

THE COURT: Overruled.

MR. MOORE: Note our exception, please.

THE COURT: Go ahead.

Q. (By Mr. Graham) What did the three men do to you, if anything?

A. Two of them pinned me to the wall. The third one took a cigarette lighter to my arm.

Q. What did he do to your arm?

A. Burned it.

Q. And did they say why they were doing that?

A. Yes.

Q. And what was that?

MR. MOORE: Object to the hearsay, the extraneous offense on collateral matters not material to any issue, Your Honor, and this is some other alleged offense that took place in Harris County involving three unknown mysterious men and we have a matter of law that I would like to take up with the Court at this time.

THE COURT: Overruled.

MR. MOORE: Note our exception. We have a motion we would like to take up with you at this time.

The record reveals that at this point, the Court sent the jury out of the courtroom and then threatened to hold the Petitioner's attorney, Mr. Moore, in contempt. Petitioner's attorney then moved for a mistrial. Without responding to the motion, the Court ordered the jury back in:

MR. MOORE: At this time the defendant would move for a mistrial in the presence of the jury since we have

not been allowed to make one in the absence of the jury.

THE COURT: Overruled.

MR. MOORE: Note our exception. We would next ask while still insisting on a motion for mistrial be made in the absence of the jury which we had to make in the presence of the jury that the Court instruct the jury to disregard the line of questioning which he elicited involving extraneous offenses involving three mysterious unnamed strangers at a time in November—November 18, far apart from the date of the alleged offense which is not material or admissible and had nothing to do with the facts of the crime charged and it's prejudicial and inflammatory to the defense in the trial of the case of aggravated rape on or about August 17, 1974.

THE COURT: Overruled.

MR. MOORE: Note our exception.

THE COURT: Go ahead, Mr. Graham.

Q. (By Mr. Graham) All right. These three people came into your home and pinned you to the wall and burned you with a cigarette. Did they say anything while this was going on, did they tell you why they were doing this?

MR. MOORE: This is rank hearsay as to something stated out of the presence—

THE COURT: Overruled. Go ahead.

Q. (By Mr. Graham) Will you tell us what they said while they were doing this to you?

A. They stated that to go down and drop charges against Steve Menzies, and if I didn't, something else would happen to me, and continue to happen to me, and not only me.

Q. And do you still have scars from that burning?

A. Yes, sir, I do.

Q. Will you walk over here and demonstrate to the jury those scars? Show them the scars.

MR. MOORE: This is highly prejudicial to the defendant. If somebody did burn this person at any time, it wouldn't be admissible as to my client for the offense which he's on trial today.

THE COURT: Overruled.

MR. MOORE: Note our exception.

Q. (By Mr. Graham) Would you step over here, please, ma'am. I'll ask you to show the jury where it happened.

A. Right here.

Q. Would you point to the jury where it is?

A. The mark here.

Q. Could you walk out here and just hold you hand out so they can see?

A. (Witness complying).

MR. MOORE: We will renew our objection to this person showing her scar as not being material to any issue and also that it's highly prejudicial, suggestive of another offense and we would object to it on those grounds.

THE COURT: Overruled.

MR. MOORE: Note our exception.

Q. (By Mr. Graham) And are you at this time afraid for your life?

A. Yes, I am.

Q. And have you moved to a different residence?

A. Yes, I have.

Q. You don't have to tell us where.

THE COURT: Don't say where it is.

Q. (By Mr. Graham) Did you meet the defendant the next day like you told him you would?

A. No, no.

MR. GRAHAM: I pass the witness, Your Honor. (R. 288–304; emphasis added).

Thereafter the prosecution in its closing argument to the jury made the following allegations:

"I think you can see a pattern, Ladies and Gentlemen. In this case, from the very beginning, even back when Linda Bivin was raped, of a defendant and his attorney setting up an alibi, having witnesses testify to certain things, *threat-*

*ening witnesses.* There's a pattern throughout this whole episode with this defendant and the evidence that you heard, I think, shows you that. Now, Sylvia Aiken down to Deborah Stone being threatened, down to Linda Bivin and the call about the alibi, he picks on women, picks on women in bars specifically hoping they will be too embarrassed to file charges because they were in a bar. *Then he frightens them into dropping the charges.* We don't know what he's done on other dates, Ladies and Gentlemen. All you know is what's in evidence and that's all you can consider. But it's certainly in those instances we've been able to bring to you, it certainly shows a specific scheme and design of taking women, after raping them, *and scaring them into dropping charges.*" (R. 772–73; emphasis added)

The only evidence which possibly linked Petitioner with the alleged attack by the three unidentified men was the complainant's testimony that the Petitioner had threatened her on a prior occasion. Respondent has argued that this testimony by the complainant constituted circumstantial evidence of Petitioner's link with the alleged extraneous offense and that the complainant's subsequent testimony as to the alleged attack by the three unidentified men was properly bootstrapped into admissibility. We agree with the Court below which, in denying Petitioner's application for a writ, conceded that "[t]here was no evidence presented at trial that linked petitioner with the alleged attack." (Tr. 12) That the jury was allowed to consider the testimony concerning the alleged extraneous offense and that, in summation, the prosecutor was allowed to argue it and implicate the Petitioner, strongly supports the Petitioner's claim that he received a constitutionally unfair trial.

Although this episode in itself, even when coupled with the prosecutor's improper closing argument, probably could not be considered "a crucial, critical, highly significant factor in the jury's determination of guilt," *Whittington v. Estelle,* 704 F.2d 1418, 1422 (5th Cir.1983), and therefore would not justify federal habeas relief, it did serve as an important backdrop for a second occurrence which effectively foreclosed any remaining chance that Petitioner may have had of receiving a constitutionally fair trial.

### The Alleged Subornation of Perjury by Defense Counsel Claim

To support Petitioner's version of the events, the defense called one of his former employees who testified on direct examination that she had seen Petitioner in the restaurant drinking coffee at 3:30 a.m. on the morning in question. On cross-examination, however, the following transpired in the presence of the jury:

Questioning by Mr. Graham:

Q. Have you been told what to say in this case? "Yes" or "No"?

A. I really don't want to say.

Q. Well, are you afraid?

THE COURT: You have to answer the question. Go ahead and answer the question.

THE WITNESS: Yes, sir.

Q. (By Mr. Graham) You have been told what to say?

A. Yes, sir.

Q. Did they tell you to come here and say that Steve Menzies was in Denny's Restaurant?

A. I don't feel very good.

Q. I beg your pardon?

A. I don't feel very good.

Q. I can understand that, ma'am. I have to have an answer to that question.

Did they tell you to come in here and say that Steve Menzies was in Denny's Restaurant at 3:30 in the morning on August 17?

A. I really don't feel very good.

Q. Can you answer that "Yes" or "No"?

A. (No response).

Q. Are you afraid at this time?

A. Yes, sir.

Q. Are you afraid of what might happen to you if you answer that question?

A. I just don't know.

Q. Are you afraid of this defendant?

A. No, sir.

Q. Are you afraid of anybody that works for this defendant?

A. (No response).

Q. What are you afraid of?

A. Right now, I'm just very much afraid of everything.

Q. Well, you're under oath to tell the truth. If you tell the truth, there's nothing that can be done to you, ma'am.

A. Okay. Okay. I forgot what you were asking.

Q. Did they tell you to come in here and say that you were in Denny's at 3:30?

A. Yes, sir.

Q. And did they come in here and tell you to say that you saw the Defendant in Denny's, did they tell you to come in here and say that?

A. Yes, sir.

Q. And did you really see the defendant in Denny's at 3:30?

A. No, sir.

Q. And who was it that told you to say that?

A. I really don't feel very good.

Q. Ma'am, you will be afforded protection, but we need to know the answer.

A. I'm sorry. I forgot what you asked me.

Q. Who was [it] that told you to come in here and tell this jury you saw the defendant in Denny's?

A. Well, several people.

Q. Who?

THE COURT: You may answer it.

THE WITNESS: Well, everybody that was involved.

Q. (By Mr. Graham) All right. And who would that include?

A. Will they get in trouble?

Q. That doesn't concern you, ma'am. That's for someone else to decide. Your only job is to tell the truth while you're under oath on the witness stand.

A. Golly! Golly! Just everybody that was involved in it.

Q. Does that include the defendant's family, the defendant's lawyers; who does it include?

A. Well, I can't really say that.

MR. MOORE: Your Honor, could I have this witness on voire dire. This is a serious accusation.

THE COURT: No, sir. Go ahead. You may answer the question. Don't worry. Go ahead.

THE WITNESS: Well, to begin with, I really can't say that—*I really can't say that Steve is responsible for it now,* because, you know, he hasn't been around for a long time. He's been gone.

Q. (By Mr. Graham) Responsible for what?

A. For me saying this and honest to God, what I'm saying is the truth, and I really can't remember if he asked me—I swear to God, I just can't remember if he did. I remember that he did approach me. That was the truth when I worked for him, and he did tell me the situation he was in, and he was concerned about it. But I can't remember if he did ask me to do this or not. I swear to God, my mind is blank. I can't remember because it's been a long time ago since I talked with Steve. This was before he went, you know, before he left.

But then his wife knew about it, and she wanted me to because she was very concerned about their little girl and Steve, and she, you know, *and Mr. Moore knew about it,* and then his lawyer—

Q. Is that the man that just stood up over there?

A. And that's all. Everybody that was involved, and Mark knows my fiance and me—knew about it. He was aware of it. They knew I wasn't in

Denny's, and that's all that I can remember.

Q. And was there threats made to you if you did not testify?

A. Well, no, exactly, no.

Q. Was there money offered?

A. No, sir. I was not paid any money.

Q. And were you afraid not to testify?

A. Well, I guess I was afraid to do it. As it all came down to it, I was—I was just afraid both ways. (R. 573–78; emphasis added).

On cross-examination Petitioner's attorney attempted unsuccessfully to refute the accusation that he knew of or participated in the alleged efforts to suborn perjury by showing the witness written statements she had signed under oath, attesting to her having seen Petitioner on the occasion in question. The following transpired in the presence of the jury:

Q. (By Mr. Moore) Sylvia, think very carefully. Have I ever at any time suggested what your testimony should be?

A. (No response).

Q. Have I ever said, "Sylvia, say thus and so."

A. Yes, sir.

Q. And I said to tell the truth, did I not?

A. Well, yes, sir. *But you knew it wasn't the truth.*

Q. Well, you knew it wasn't the truth, Sylvia. But I'm saying when I told you to testify, I said, "Sylvia, tell the truth." Did I not?

A. *You told me to tell what's on that paper.*

     \*    \*    \*    \*    \*    \*

Q. Well, now when you wrote out that statement, you say now that's not true?

A. Well, yes, sir. *Mr. Moore, you knew that.*

Q. How could I have known if I never had any conversation with you?

A. *I told you, Mr. Moore.*

Q. When did you tell me that?

A. Well, you, personally, yesterday. *But the other [defense] lawyers knew it before.*

Q. You told me this yesterday, where?

A. Are you trying to say that I'm lying, Mr. Moore, now?

Q. Sylvia, what we would like to know is when did you say that you told me about this statement?

A. Yesterday.

Q. What time and where?

A. You, personally, but the other guys already. knew.

Q. Do what now?

A. The other [defense] lawyers already knew.

     \*    \*    \*    \*    \*    \*

Q. But did you ever say to me those statements are not true?

A. Yes, sir.

Q. When?

A. Yesterday.

     \*    \*    \*    \*    \*    \*

Q. Is it your testimony that you said to me yesterday, "that I gave you a false statement"?

A. I don't understand. Am I testifying that I told you yesterday that I didn't know this was true?

Q. Yes.

A. Yes, sir. I didn't know.

Q. That's what I say, I didn't know.

A. That this wasn't true?

Q. That's right.

A. I didn't know you did not know this wasn't true? I didn't know—well, in other words, *you knew that this wasn't true.* That's all I can say.

Q. Well, how did I know if you didn't tell me any such thing?

A. (No response).

    MR. MOORE: I'm upset, Judge.

    THE COURT: All right.

    THE WITNESS: Are you finished with me?

    MR. MOORE: If the Court, please I would like to introduce into evidence Exhibits 8 and 9 [the witness's written statements].

THE COURT: Admitted.

Petitioner's lawyer then further cross-examined the witness in an effort to discredit her apparently unexpected subornation allegations. Although the witness stuck with her accusations, she continued to direct them at Petitioner's lawyers and not at the Petitioner himself.

Petitioner's lawyer then called a succession of witnesses, including Petitioner's wife; Michael Eheman and Nathan J. Hellums, two attorneys associated with Mr. Moore in the practice of law who had participated in the preparation and execution of Ms. Aiken's written statements; and Wanda Taylor, Mr. Moore's secretary. Each of these witnesses stated that Ms. Aiken had never denied the truthfulness of her written statements prior to trial.

When Petitioner took the stand, he testified that he was in fact at the Denny's restaurant on the morning in question but that he had not seen Ms. Aiken there. He also testified that it was Ms. Aiken who initially advised him that she had seen him on that occasion.

There is no evidence in the record that Petitioner himself knowingly participated in a scheme to secure perjured testimony from Ms. Aiken or that he otherwise had any reason to believe that Ms. Aiken would testify falsely at his trial. Nevertheless, during his closing argument to the jury, counsel for the state repeatedly asserted that defense counsel had actively suborned perjury, and implied that the Petitioner was involved in that misconduct:

"* * * I cannot imagine the gall it must take for him [Mr. Moore] to get up here and tell you what he's told you about Sylvia Aiken and me or this office having something on Sylvia Aiken, his witness who he called up here, who was so scared that she fell apart on the witness stand before he started talking to her, and after being caught in one lie, told him that she wasn't going through with it any more, *and she wasn't going to lie for him and his people or the defendant and his people.* You can decide whether I've got something on Sylvia Aiken. I'm the one that caused her to tell the truth.

That's all I can say. *[Mr. Moore is] up here trying to save his own skin and all the lawyers that work with him as well as the defendant."* (R. 761–62; emphasis added).

*       *       *       *       *       *

"Then the defense starts bringing all the lawyers and people involved in these false statements taken from Sylvia Aiken trying to save their own necks and what else are they going to say except, 'I didn't do anything.'" (R. 779–80).

### The Decision

Based on these facts, Petitioner's conviction quite possibly would have been reversed had these same claims been presented to the state court on direct appeal. *See, e.g., Guerrero v. State,* 650 S.W.2d 102, 104 (Tex.Civ.App.—Houston [14th] 1983, no writ). However, "we do not sit as a 'super' state supreme court in a habeas corpus proceeding to review errors under state law." *Cronnon v. State of Alabama,* 587 F.2d 246, 250 (5th Cir.1979) (quoting *Martin v. Wainright,* 428 F.2d 356, 357 (5th Cir.1970)). Rather, the issue before us is whether Petitioner was denied the fundamentally fair trial he is entitled to under the United States Constitution.

An unfair trial has been characterized as one that has been "largely robbed of dignity due a rational process." *Houston v. Estelle,* 569 F.2d 372, 383 (5th Cir.1978). Whether a criminal defendant has received such a "dignified" or "fair" trial, as mandated by the fourteenth amendment, must be determined by examining the particular facts of each individual case. "[A] trial that is unfair, whatever the cause of such unfairness, violates Fourteenth Amendment due process." *Fitzgerald v. Estelle,* 505 F.2d 1334, 1336 (5th Cir.1975). However, the mere erroneous admission of prejudicial testimony does not, in itself, justify federal habeas relief unless it is "material in the sense of a crucial, critical, highly significant factor," in the context of the entire trial. *Porter v. Estelle,* 709 F.2d 944, 957 (5th Cir.1983). Likewise, a prosecutor's improper argument will, in itself, exceed constitutional

limitations in only the most "egregious cases." *Houston v. Estelle*, 569 F.2d 372, 382 (5th Cir.1978).

In some cases, an accused can be denied due process of law because extraneous considerations render improbable or impossible an impartial judgment as to guilt, wholly apart from defense counsel's ineffectiveness in preventing the prejudice.[1] In other cases, an accused is denied due process precisely because the extraneous considerations effectively crippled the ability of the Defendant's lawyer to present his defense.[2] The excerpts from Petitioner's trial quoted above reveal that his trial was infected with extraneous considerations of both varieties.

We emphasize that this trial essentially involved a credibility choice between the testimony of the complainant and the Petitioner and, thus, was not a case in which the prosecutor introduced overwhelming evidence of guilt. Nor, was this trial one in which "the trial court took special pains to correct any impression that the jury could consider the prosecutor's statements as evidence," as was the case in *Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974).

Further, we do not hold that any single passage of testimony or prosecutorial comment which transpired during the course of Petitioner's trial was a per se violation of due process. We have concluded only that the quoted passages and comments, when evaluated in the context of the trial as a whole, were extraneous considerations which unfairly prejudiced the jury against the Petitioner and, perhaps more importantly, crippled the ability of the Petition-er's lawyer to present an effective defense on his behalf.

We therefore hold that the testimony concerning the alleged threats, as well as the testimony concerning the alleged subornation scheme, when combined with the prosecutor's closing argument in which he, without an evidentiary basis, implied that the Petitioner was somehow directly involved in both of these extraneous and prejudicial matters, denied D. Stephen Menzies that fundamentally fair trial to which he was entitled by the due process clause of the fourteenth amendment. The denial of the petition for habeas corpus is reversed. The writ must issue. The case is remanded with instructions that the district court set a reasonable time within which Texas may try Menzies again.

REVERSED and REMANDED.

---

1. Familiar examples of instances in which actual or potential prejudice to the accused has unacceptably affected the deliberative processes of the jury are those involving mass media publicity, *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); cases involving mob-dominated proceedings such as *Moore v. Dempsey,* 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923); and, the trial of an accused in a prison uniform or shackles, *Boswell v. Alabama,* 537 F.2d 100 (5th Cir.1976).

2. *E.g.,* in *Houston v. Estelle*, 569 F.2d 372 (5th Cir.1978), the prosecutor repeatedly attacked the motives of both the defendant and his lawyer, including references to the defense motions for mistrial and objections as thinly disguised efforts to keep both the truth of the case and its decision from the jury. We held that the trial was fundamentally unfair and set aside the conviction; *cf. United States v. Gonzalez,* 547 F.2d 291, 294–97 (5th Cir.1977) where we reversed because of a combination of improper cross-examination of defense witnesses and the trial judge's disparagement of counsel in the presence of the jury.