Richard Donald **FOSTER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 69575.

Court of Criminal Appeals of Texas, En Banc.

June 28, 1989.

Rehearing Denied Sept. 20, 1989.

Michael Logan Ware, Bill Lane, Fort Worth, for appellant.

Amy Ayers Adams, Dist. Atty., and Donald Schnebly and Christopher Curtis, Asst. Dist. Attys., Weatherford, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted of capital murder. See V.T.C.A., Penal Code Sec. 19.-03(a)(2). After the jury made an affirmative finding on both of the two special issues submitted under Art. 37.071(b)(1) and (2), V.A.C.C.P., the trial court imposed

the penalty of death. This case is before us on direct appeal.

Appellant presents us with twenty points of error. A review of the facts is necessary.

Deputy H.L. Rice of the Tarrant County Sheriff's Office began his shift on April 4, 1984 at 11:00 p.m. Rice was assigned to patrol the northwest corner of Tarrant County until his shift ended at 7:00 a.m. on April 5, 1984. At approximately 4:00 a.m., Rice was east of Azle on the Jacksboro Highway, also known as State Highway 199. He observed a "white over red" Chevrolet two-door: with Texas license plate GPW–857 parked on the southern service road, east of the Hob Nob Bar. There were two people in the car, the driver and a female. Rice identified the driver as the appellant, Richard D. Foster, by Foster's Texas driver's license. Rice did not identify the female. Evidence admitted later during the guilt phase of the trial indicated this female was Vicki Elaine Easterwood. Rice spoke with appellant for about three minutes, and then continued his patrol. At trial, Rice testified that appellant's car was parked approximately fifteen miles from Springtown.

At 7:15 a.m. on April 5, Gary Cox woke up, showered and got a cup of coffee. He left his wife and nine day old daughter at home and went to work at his combination feed store, convenience store and gas station. The store was a mile from Cox's home and two miles west of Springtown. At trial, his widow testified that Gary Cox took $300.00 in cash with him to open his store.

At 7:40 or 7:45 a.m. on April 5, Linda Morgan arrived at Gary Cox's store to buy some milk. As she was leaving the parking lot, she passed a General Motors automobile with a "cream colored" vinyl top. The driver of the automobile wore a toboggan type hat and had a beard. At trial, Morgan identified appellant as the driver.

Zack Leatherwood had leased the feed store to Gary Cox on April 1, 1984. The store was located on the same property as Leatherwood's home. On the morning of

April 5, Leatherwood walked down to the feed store. As he got close to the rear of the store, Leatherwood heard a gunshot and saw Gary Cox fall "right back out of that store with his neck about half blowed off." The next thing Leatherwood remembered was hearing Ken Davis yell to get out of there. Leatherwood then ran back to his house to get his shotgun. When he returned to the store, Leatherwood checked Cox's vital signs and determined that he was dead. Leatherwood then entered the feed store. He saw the cash drawer was open, change scattered on the counter, and a $5 bill laying on the counter. The cash drawer was empty.

Kenneth Davis had driven to Gary Cox's feed store at around 7:30 a.m. on April 5. When he arrived at the store and got out of his truck, he saw a "real clean" older model General Motors car parked at the feed store. Davis described the car as "persimmon red with a white half-vinyl type." Just as Davis entered the store, he heard a "real loud explosion". In his own words, Davis

> was just startled and I yelled, 'Hey,' as loud as I could, and just stood there for a split second. And suddenly across the store, a man with a shotgun pointed at me and says, 'Man, you better get the hell out of here.' And I said, 'I'm leaving,' and I turned around and ran.

When Davis got out of the store, he ran towards Zack Leatherwood's house. Seeing Leatherwood, Davis yelled to warn him of what happened at the store. When Davis got to the Leatherwood's fence gate, he turned to look back at the store. He testified, "I saw this persimmon red car with a white vinyl top leaving the store area going west on Highway 199." At trial he identified State's Exhibit # 13 as a photo of that car. In that photo, the car bears Texas license plate # GPW–857.

At trial Davis physically described the man he saw with the shotgun. He was a white male, approximately 5' 10", who had a beard. He wore a lumberjack type hat. He held a short-barreled shotgun. Davis was unable to describe the facial characteristics of the man because "he had a shot-gun on me" and because part of the man's face was covered.

Donald Teague, the chief deputy of the Parker County Sheriff's Office, responded to a call for investigation of the shooting on April 5, 1984. Teague continued his investigation through April 28, including interviews with Leatherwood and Davis. On April 28 and 29, Teague interviewed Vicki Elaine Easterwood. This interview began at the Graham Police Department and continued at the Young County Jail. Subsequently, at 12:22 p.m. on April 29, Teague met with a Justice of the Peace in Weatherford, Texas and obtained a capital murder arrest warrant for appellant.

Teague searched unsuccessfully for appellant from April 29 until May 10. On the 29th of April he interviewed Kathy Nievar, appellant's former live-in girlfriend. She was unable to help Teague locate appellant. On May 10, Teague went to the Citizen's National Bank on Highway 190 in Breckenridge. He was present when appellant was arrested by members of the Federal Bureau of Investigation. At that time, appellant identified himself as "Stoney Armadillo."

Tommy Martin, an officer with the Graham Police Department, saw appellant in Graham on March 30, 1984, six days before the instant offense. At that time appellant was with Vicki Easterwood in the persimmon red car with a white vinyl top which Ken Davis testified that he saw at the feed store. On the day the capital murder arrest warrant was issued, Martin was looking for the persimmon red car with the white vinyl top in Graham. He stopped the car and discovered it was being driven by Kathy Nievar.

Nievar first met appellant in August of 1982. They soon began living together in Irving, Texas. They broke up in December of 1983. She did not see appellant again until late April of 1984. The last time she saw appellant was on the evening of April 28 at 9:00 p.m. Nievar noticed that appellant was tired and nervous. Appellant had a pistol at the time. Appellant borrowed Nievar's car (a 1978 Buick) and left his own for her to drive. Officer Martin stopped

her in it on the 29th, and she drove it to the police station to be left there. Later that night, appellant called her and told her that her Buick would be returned that night. He then hung up. Nievar did not hear from appellant again.

On April 29, 1984, Deputy James Moody of the Parker County Sheriff's Office traveled with Sheriff Billy Cain to the Young County Sheriff's Office in Graham to meet with Vicki Easterwood, and assist in the investigation of the instant case. Earlier that day, Vicki Easterwood discussed with the authorities what she knew of appellant's actions on April 5th after the commission of the instant offense. Vicki Easterwood informed the authorities that appellant got rid of the shotgun after leaving the scene. Sheriff Cain, Deputy Moody, and Easterwood left Graham and drove to Wise County. Their destination was a stock tank which lay south of Farm Road 1810, one and a half miles east of the Wise/Jack County line where they hoped to recover evidence of the instant offense. When they arrived at this location, Vicki Easterwood had a discussion with Moody and Sheriff Cain, and she then made a throwing gesture toward the stock tank. Later that day, Vicki Easterwood was returned to Graham by Moody.

Moody returned to the stock tank in Wise County on May 30, 1984 with Mark Wade, a diver from Weatherford. While searching the tank, Wade found a satchel which contained items of clothing, a .12 gauge shotgun shell and a sawed-off shotgun. At trial these items were admitted into evidence. At trial Dr. Nizam Peerwani testified that the sawed-off shotgun recovered from the stock tank was capable of inflicting the fatal wound to Gary Cox.

Jack Bellinof was working for Gooch Meat Packers on May 10, 1984. He was driving his regular route as a salesman from Olney to Throckmorton on Highway 70. At approximately 9:00 a.m. Bellinof stopped to pick up a rider, who Bellinof later identified as appellant. They made small talk until appellant indicated where he wanted Bellinof to let him out. After he

stopped the car, appellant told Bellinof, "This is where you get off."

Appellant then attacked Bellinof with a revolver. The two of them struggled over the gun at first. Appellant then drew a second pistol and succeeded in shooting Bellinof four times: in the right shoulder, in the jaw, in the left hand and in the back of the head. Bellinof managed to open his door and get out of the car. Appellant got in the car and drove off, leaving Bellinof in the road.

On May 10, 1984, Scott Harris was working at his job as a senior vice-president of the Citizen's National Bank in Breckenridge. At 11:45 a.m., the appellant entered the bank carrying two pistols and yelled he was taking control of the bank for his own protection. Appellant threatened to kill anyone who failed to comply with his orders. Appellant took seven hostages: four men, including Harris, and three women. Appellant indicated to his hostages that both Young and Parker County authorities were pursuing him for a murder in Parker County. At trial, on cross-examination, Harris recalled that appellant told him the Parker County authorities were after him for what happened in Parker County. Harris admitted at trial that appellant claimed to be innocent of the Parker County charges.

After hearing all the evidence in this case, the jury convicted appellant of the capital murder of Gary Cox. At punishment, the State admitted into evidence a penitentiary packet which reflected the following prior convictions which were served concurrently: credit card abuse, for which his 1975 probation was revoked; aggravated robbery, committed on June 16, 1976; aggravated robbery, committed on June 21, 1976; and aggravated robbery, committed on June 22, 1976. Appellant received a total sentence of eighteen years.

Appellant called several witnesses at punishment. The officer in charge of him during trial stated appellant had caused him no trouble. His father testified appellant had been a fine person until he returned home from Viet Nam in 1972. His father explained that appellant had a drug

problem. A private consultant in the field of corrections testified that appellant would never be paroled from a life sentence for capital murder.

The jury answered the special issues affirmatively.

■ We will consider appellant's points of error in chronological order, beginning with voir dire. In his eighteenth point of error, appellant states it was error for the trial court to grant the State's challenge for cause to venireman Boling. Though appellant concedes that Boling admitted his opinions of the death penalty would affect his deliberations, appellant argues this was not sufficient to disqualify Boling. According to appellant Boling did not explicitly say that he would hold the State to a higher burden of proof on the special issues. Appellant also points out that Boling admitted to defense counsel, at one point, that he could consider the death penalty and answer the special issues affirmatively if the State met its burden of proof.

The State responds that Boling's answers on voir dire established that he was biased in such a manner as to be unable to fairly confront the issues in a capital murder prosecution. The State explains that Boling stated that he could never sentence someone to death, that he did not believe it was possible to affirmatively answer special issue number two, and that he thought his position on the death penalty would impair his ability as a juror. The State, asserting reliance on *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), claims that Boling's views would substantially impair his performance of his duties as a juror in accord with his instructions and oath. The State rejects any duty that it should show Boling would automatically vote no to the special issues for him to be disqualified. A review of the voir dire of venireman is necessary.

When the State first asked Boling for his opinion of the death penalty, Boling stated that he could not sentence anyone to death. The State then explained to Boling that a jury in a capital murder trial answers special issues without directly assessing the death penalty. Boling testified that he was still opposed to the death penalty. He expressed a desire to honestly answer the special issues, but mentioned that his opposition to capital punishment was such that he was unsure if he could set it aside and answer the questions. Boling stated that his opposition would probably substantially impair his service as a juror. Boling said, "I believe people need to pay for their crimes, but I think they can do it without being put to death."

The State asked the trial court to excuse venireman Boling on the State's challenge for cause. The trial court deferred its ruling on the State's challenge until after appellant had a chance to rehabilitate Boling.

Appellant started by describing to Boling how the jurors would be instructed to only answer the special issues independently of each other without regard to the result of the answers. Boling stated he would rather not have to give answers. He also said it was hard for him to say if he could follow the law, and that he would hate to have to give it his best guess. Boling testified he honestly did not know if he could or could not follow the law.

Appellant then broke down the individual special issues, and asked Boling if he could base his answers on the evidence presented and if he could answer "yes" if the issue was proven beyond a reasonable doubt. Boling stated he would not have trouble with the first special issue. See Art. 37.-071(b)(1), V.A.C.C.P. On the second special issue, Art. 37.071(b)(2), *supra*, Boling first stated that was a hard question. Then, in marked contrast to his answers to the State, Boling testified that he guessed that he could answer "yes" to the second special issue.

Appellant then asserted that venireman Boling was qualified. The trial court stated that because Boling admitted that his service as a juror would be substantially impaired by his opposition to the death penalty, the trial court was inclined to grant the State's challenge for cause. Appellant requested that he be allowed to question Boling further on his opposition to capital punishment.

When appellant asked Boling if he had just testified that he would answer the special issues "yes" if the evidence proved the issues beyond a reasonable doubt, Boling vacillated again. He stated that, "I don't see how you could get to beyond a reasonable doubt, because people can change." He also stated that he did not know if there could be a sufficient set of circumstances to justify a "yes" answer to the second special issue. Appellant asked, "theoretically, if the State proved to you beyond a reasonable doubt, you have indicated you could answer them, 'yes'. Is that correct?" Boling, vacillating again, replied, "If they could."

At this point, the trial court overruled the State's challenge for cause to venireman Boling. The State requested that they be allowed to reopen their voir dire of Boling. Appellant did not object. The trial court granted the request.

Boling began by stating that he was still opposed to the death penalty. The State asked Boling, "Can you answer these questions, or are you opposed to the death penalty and just can't serve as a juror in this type of case?" At this point, Boling again changed his mind. He responded, "I would rather not serve, sir. I don't see how you could prove number two. I don't see any way you could prove it."

The State pressed the issue to Boling by asking, "Are you saying to me, sir, with regard to question number two that you just don't think the State could ever prove that to you?" Boling replied, "I don't think so. I don't think anyone could. Not without a doubt, you know, there would be a doubt there." Boling continued by stating that perhaps the issue could be proven to someone else, but not to him.

But the voir dire was not completed until after Boling wavered again in his ability to follow his instructions and oath. While still under questioning by the State, Boling stated he could follow the law. The State then asked if Boling meant he could answer the issues fairly and impartially. Boling closed his voir dire by responding that he still did not think there could be a "yes" answer on the second special issue. The

State challenged Boling for cause. Appellant submitted that Boling was qualified. The trial court granted the State's challenge for cause.

From this voir dire, it appears that Boling's view of the death penalty would substantially impair his abilities to perform his duties as a juror in accordance with his instructions and oath. It is not dispositive that Boling stated at one point that he could base his answer to special issue number two on the evidence presented and that he could vote yes if the State proved it beyond a reasonable doubt. At another point, Boling also stated his opposition to the death penalty would substantially impair his service. Boling may not have explicitly said he would hold the State to a higher burden of proof, but his comment that he would always have a doubt about the second special issue implies as much. The complete voir dire of Boling reveals a murky picture of a venireman who repeatedly vacillated in his answers on whether his opposition to the death penalty would prevent him from fairly and impartially answering the special issues.

When the record of voir dire is unclear, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright v. Witt, supra,* 105 S.Ct. at 854; *Bird v. State,* 692 S.W.2d 65 (Tex.Cr. App.1985) cert. denied, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). If the entire record contains sufficient evidence to support a trial court's determination that a juror would be prevented or substantially impaired from obeying his oath and instructions, deference must be paid to that determination.

In the instant case, the instability of venireman Boling's views is reflected in the decisions of the trial court in ruling on the challenge for cause. At first, because Boling explained that his service would be substantially impaired, the trial court stated it would grant the State's challenge. When appellant received Boling's answer that he could follow the law on the second special issue, the trial court decided to

overrule the challenge. Lastly, when Boling's answers indicated he would hold the State to a higher burden of proof on the special issues than his oath and instructions would require, the trial court granted the challenge for cause. Boling's demeanor and his equivocating and vacillating answers on voir dire, along with his opposition to the death penalty, obviously convinced the trial court that Boling would be substantially impaired.

As this Court stated in *Hernandez v. State*, 757 S.W.2d 744, at 753 (Tex.Cr.App. 1988), "Particularly where a venireman is shown on the record to be genuinely non-committal, vacillating, equivocal, or uncertain, we must make allowances for the fact that a judge, trying his qualifications for jury service, had an opportunity to observe his demeanor, intonation, and expression." Boling was a genuinely vacillating venireman whose opposition to the death penalty would have caused him to thwart the law by answering special issues in accordance with his bias, irrespective of the evidence. See Judge Clinton's dissenting opinion in *Reynolds v. State*, 760 S.W.2d 351 (Tex.Cr.App.1988). The record of Boling's voir dire supports this deference to the decision of the trial court. Point of error eighteen is overruled.

In his fourth point of error, appellant complains the trial court erred by refusing to allow the appellant to have a pre-trial hearing on his motion for a change of venue. The State responds that the appellant was not denied an opportunity to have a pre-trial hearing. The State argues that appellant effectively dropped his motion for change of venue and waived his opportunities to present evidence on the motion.

When a defendant files a motion for change of venue, he may present evidence in support of that motion at a pre-trial hearing. Because a question of a change of venue is a question of constitutional dimensions. *Enriquez v. State*, 429 S.W.2d 141 (Tex.Cr.App.1968), a defendant's failure to comply with the time limitations of Article 28.01, V.A.C.C.P., does not waive the defendant's right to a hearing to consider evidence on his motion.

*Revia v. State*, 649 S.W.2d 625 (Tex.Cr. App.1983). It is not necessary that a motion to change venue be filed 10 days before a pre-trial hearing or 10 days prior to jury selection. A hearing is called for when the issue of venue has been joined by a defendant filing his affidavits in support of his motion and by the State filing controverting affidavits. Articles 31.03(a) and 31.04, V.A.C.C.P.

A trial court may hold this hearing any time prior to the commencement of a trial. In the past, this Court held that a plea to venue was barred because it was made after the defendant announced ready, the jury was impaneled and the defendant pled to the indictment. *Morris v. State*, 43 Tex. Crim. 289, 65 S.W. 531 (1901). In *Henley v. State*, 576 S.W.2d 66 (Tex.Cr.App.1979), this Court spoke of an entitlement of a defendant to be able to show there was sufficient prejudice in the community in spite of being able to select a jury of twelve people who were not subject to a challenge for cause. *Henley*, at 72. In *Henley*, this Court decided it was not wrong for the trial court to hold the ruling in abeyance until after voir dire, so the court could use the voir dire to help gauge the community attitudes and opinions concerning a defendant. ·See also, *Adami v. State*, 524 S.W.2d 693 (Tex.Cr.App.1975). In *Henley*, the trial court erred when it refused to hold a hearing on the change of venue after the jury was selected.

Unlike *Henley*, the defendant in *Faulder v. State*, 745 S.W.2d 327 (Tex.Cr.App.1987) waited until after the 99th venireman had been examined and excused to make his motion for a change of venue. The trial court then held a hearing on the motion. Even though the motion was untimely filed, this Court held the point of error was not waived and reviewed the evidence introduced at the hearing. *Faulder*, at 338. In *Faulder*, this Court did not decide when it is too late to file a motion for change of venue. This Court implied that it could be filed any time during the selection of the jury.

In *O'Brient v. State*, 588 S.W.2d 940 (Tex.Cr.App.1979), the defendant filed his

motion one month prior to jury selection. The State filed its controverting affidavits after the jury was selected. The trial court overruled the motion because a jury had been selected. We decided the defendant had a valid objection to the trial court's refusal to hold a hearing. It is apparent that it is permissible for a trial court to conduct an evidentiary hearing on a motion for change of venue after the jury had been impaneled, and before the defendants plea to the indictment. *Faulder, O'Brient, Henley,* and *Morris.*

In the instant case, appellant filed his motion for change of venue on October 2, 1984. On October 10, 1984, the trial court held a pre-trial hearing and asked appellant if he had filed his supporting affidavits. Appellant said that he had not filed them yet, but that he would file them within ten days. The State informed the trial court they would certainly controvert the appellant's application. The trial court announced that in the event the State contested the application, he would set a hearing to decide change of venue.

On the afternoon of Friday, October 25, 1985, after jury selection in the instant case had been going on for two weeks, appellant filed two affidavits in support of his motion for change of venue. Both affidavits had been sworn to on October 22, 1985. Appellant did not file his own supporting affidavit, as required by statute. Art. 31.03(a), V.A.C.C.P.

On Monday, October 28, 1985, appellant stated he wanted a hearing on his change of venue. The State said it would be ready for the hearing as soon as its controverting affidavits were filed. The State also expressed the belief the hearing would not take long once their witnesses arrived. The trial court asked appellant if they couldn't start on venue and finish it up later on. The appellant represented he was ready on his motion and that he only needed to call the two affiants to testify at the hearing. The trial court gave the State the opportunity to file its controverting affidavits.

Later that morning, the State succeeded in obtaining four controverting affidavits which complied with Art. 31.04, V.A.C.C.P. These were filed before noon on October 28, 1985. When the trial court had concluded with other matters that day, he turned back to the matter of venue. The trial court asked both parties if they were now ready to proceed. Appellant then informed the trial court that he needed more time to achieve service for, and secure the appearance of, various news media witnesses. The trial court reset the hearing for Saturday morning, November 2, 1985.

At this time, appellant put the trial court on notice that he wanted the venue hearing held before the last juror was selected. Appellant expressed his belief the venue issue would be moot once the jury was selected. The trial court informed appellant that he would confront the venue issue as planned, in that he would proceed with picking a jury first and conducting the venue hearing afterward.

When the trial court reopened the proceedings on Tuesday morning, the 29th, he informed the parties that due to a personal conflict they would not be able to hold the venue hearing on Saturday morning. The trial court suggested the hearing be held on the 29th, 30th or 31st, at a time convenient to both parties. Appellant again stated he wanted the venue hearing held before proceeding with selection of any more jurors. The trial court overruled this request and proceeded with voir dire. For the rest of October 29th, appellant objected before each member of the venire was brought in that he wanted his venue hearing held before voir dire proceeded any further. The trial court overruled each objection.

When the trial court reopened the case on the morning of October 30th, appellant noted that the parties were trying to select the twelfth juror from the panel. Appellant reurged his objection that voir dire should be suspended pending the convening of a hearing on venue. The trial court overruled the objection and proceeded with voir dire, overruling the same objection made before each new venireman was brought in.

After the fourth such objection of the day, the trial court notified appellant they could convene the venue hearing at 4:00 p.m. that afternoon. Appellant responded that he was not prepared because his witnesses for the hearing were not yet there. Appellant said he would try to secure their appearance that afternoon. The parties proceeded with voir dire of three more veniremen, with appellant's objection to proceeding being overruled each time.

On the afternoon of October 30th, before the venue hearing was to be held, appellant filed a Supplemental Motion for Change of Venue. This motion was supported by appellant's own affidavit, correcting the statutory deficiency in the first motion which was filed on October 25th without the required accompanying affidavit of appellant. See Article 31.03(a), V.A.C.C.P. Attached to the supplemental motion were copies of the same sworn affidavits used to support the first application.

At the conclusion of voir dire on October 30th, the trial court announced its willingness to have a hearing on change of venue at 4:00 p.m. Appellant stated he had available one news media witness, but that he was not prepared to present that witness' testimony. Appellant complained of not having enough time to get his witnesses to Court and prepare their testimony. The trial court informed appellant that he was being given an opportunity to present testimony, and that voir dire would proceed if he did not want to take that opportunity. Appellant said he could present that witness, but that he planned to call many more and would need one or two complete days for the venue hearing. The trial court said he would hear whatever testimony appellant wished to present. Appellant belittled this option of calling his available witness to testify at that time. The trial court announced that his first priority was jury selection. He would work appellant's witnesses in to testify when they arrive. Meanwhile, the trial court planned to proceed with voir dire the next morning. Appellant told the trial court to forget about calling the available witness to testify at that time.

On the morning of October 31st, the twelfth juror was selected. Appellant's request to delay proceeding before this selection was overruled. The trial court was ready to proceed on the issue of venue. However, after the twelfth juror was selected, appellant stated,

It's our position that now that the jury has been seated, all twelve folks on the jury have been seated, that any issue as to the change of venue, the necessity for a hearing on the change of venue has become mooted by the fact we have twelve folks in the jury box and the jury has been selected.

Appellant then suggested that at some future time the trial court permit him to present his venue evidence for purposes of a bill of exception. The trial court agreed to do so whenever appellant's witnesses arrived. The appellant replied, "From our standpoint, frankly, now that the jury is in the box, it doesn't make any difference to us. We can do it two weeks from now as far as we're concerned."

At the end of that proceeding, the trial court complied with appellant's wish that the motion for change of venue was moot, and overruled it. The trial court said it would also comply with appellant's request to perfect a bill of exceptions at his leisure. Appellant made no objection to the trial court's overruling of his motion for change of venue. Appellant mentioned he wanted a chance to present evidence on a bill of exceptions as he would have if they had received a hearing before the end of voir dire. The trial court agreed. During the trial, the only objections appellant ever made were that the trial court should suspend voir dire and delay jury selection until after a venue hearing was held.

The trial court acted properly in its handling of the change of venue. It was permissible for the trial court to hold its ruling on the motion in abeyance until after voir dire was completed. *Henley, supra;* and *Adami, supra.* It was also permissible for the trial court to convene the hearing on venue after a jury had been selected. *O'Brient, supra;* and *Henley, supra.* After voir dire, the trial court would have had

the benefit of jury selection to help gauge the community attitudes and opinions toward appellant. *Henley, supra;* and *Adami, supra.* In the instant case the trial court indicated that it would hold the hearing before the trial commenced, that it could take testimony from witnesses as they arrived, and that it would schedule the hearing at the convenience of the parties.

Appellant erred in his belief he had a right to halt jury selection and stop the trial proceedings while the trial court waited for him to find and prepare his witnesses for a hearing. Appellant did not avail himself of the many opportunities given to him to have his hearing, including more than a year from the filing of his first application in October, 1984 to the filing of the supporting affidavits of his two compurgators in October, 1985 after jury selection had begun. The trial court extended to appellant more opportunities for a hearing throughout voir dire and up to the commencement of his trial. But appellant chose to drop his change of venue motion, asserting that it was moot.

Appellant's belief that the issue was moot, when in reality it was still active and viable, led him to waive the hearing and his opportunity to hear evidence on his entitlement to a change of venue. In this way, appellant ceased to advocate or advance his position that he wanted a hearing to establish his right to a change of venue as a matter of fact. Since the instant fact situation represents a case of first impression, we turn for guidance to authority from an analogous situation.

When a defendant files a sufficient motion for change of venue and the State fails to file controverting affidavits, a defendant is entitled to a change of venue as a matter of law. *McGee v. State,* 774 S.W.2d 229 (Tex.Cr.App.1989) (Opinion on original submission); and *McManus v. State,* 591 S.W.2d 505, at 516 (Tex.Cr.App.1979). However, if a defendant does not avail himself of the opportunity to demand his change of venue as a matter of law, and instead, proceeds to the hearing on his motion "without objecting there was no issue of fact to be tried because the State failed

to controvert the affidavits supporting his motion," the defendant will have waived his "per se right to a change of venue." *McGee, supra,* op. at 241. In *McManus,* the defendant not only failed to object to the hearing on the grounds that he was entitled to a change of venue as a matter of law, he also "persisted in his request for a hearing on the motion." *McManus, supra,* at 517. When the defendants in *McGee* and *McManus* went forward at their hearing to prove they were entitled to a change of venue as a matter of fact, they conceded they were not entitled to a change of venue as a matter of law.

In the instant case, appellant's decision that he did not wish to put on evidence or otherwise proceed with his evidentiary hearing after the twelfth juror had been selected effectively conceded there was no issue of venue as a matter of fact to be decided by the trial court. Combined with appellant's failure to object to the trial court's decision to overrule his motion for change of venue, appellant's decision waived the issue of whether he was entitled to a change of venue as a matter of fact in the same way the defendants in *McGee* and *McManus* waived the issue of entilement to a change of venue as a matter of law. Point of error four is overruled.

In his first point of error, appellant alleges that the evidence is insufficient to support the jury's verdict of guilty. Before addressing the sufficiency of the evidence, this Court must review appellant's points of error which deal with the admissibility of certain items of evidence.

 In his second point of error, appellant complains that it was error for the trial court to admit into evidence an arrest warrant affidavit. Appellant states the affidavit contained hearsay statements which were prejudicial to his defense. Though the complaint which accompanied the affidavit tracked the language of the statute, V.T.C.A., Penal Code Sec. 19.03(a)(2), appellant reurged in his third point of error every "fact, argument, authority and citation" against the complaint which he had submitted against the affidavit. The State

responds that the document was admissible pursuant to Art. 38.24, V.A.C.C.P. (repealed 1986).[1]

Deputy Scotty Teague testified at trial as an investigating officer for the State. Teague stated on direct that he had sworn to an affidavit on April 29, 1984, which resulted in the issuing of an arrest warrant for appellant. On cross-examination, appellant sought to impeach the credibility of both Deputy Teague and the arrest warrant affidavit.

The subject of the impeachment of Deputy Teague was his sworn statement in the affidavit that the suspect had a beard. Teague's sworn statement in the affidavit was that Ken Davis told him in a personal interview that the suspect had a "medium beard." In his cross-examination of Teague appellant sought to highlight this description of the beard to Teague, so that appellant could contrast this with his own argument that appellant had, at most, a thin and scraggly beard at the time of the instant offense. In response, Teague testified that Davis told him, "he thought the person had a medium brown beard."

Appellant immediately seized upon this statement. Referring first to Teague's handwritten notes from his investigation, appellant obtained an admission from Teague that his own notes did not reflect that Davis qualified his description of the suspect's beard:

Q. (Appellant): Are there any qualifying words that appear in that description, if you will, "short, medium brown beard."

A. (Teague): No, sir.

Q. (Appellant): Does it say maybe full short medium brown beard?

A. (Teague): Not on that it doesn't.

Appellant then questioned Teague about the affidavit, itself, and whether the descriptions of the suspect which Teague accounted for in his affidavit were tentative. Appellant then read from, and asked Teague about, his statement in the affidavit which set out Davis' description of the suspect from their personal interview:

Q. (Appellant): When you went to get a warrant of arrest, you raised your hand and you swore by the law of the State of Texas and took an oath that in fact, the person was described as being in his early 20's, 5'10" tall, weighing between 155 and 160 pounds with a medium beard. Isn't that what you swore to?

A. (Teague): No, sir.

Q. (Appellant): Or might ought to have one?

A. (Teague): No, sir.

Q. (Appellant): And the reason you didn't qualify it is because Mr. Davis hadn't qualified it, and you took him at his word. Isn't that correct, Mr. Teague?

A. (Teague): No, sir.

Q. (Appellant): Which time is correct? Because you were under oath when you made out the affidavit, and you are under oath today.

A. (Teague): Yes, sir.

Later on cross-examination, after appellant asked Teague to review Davis' April 5th written statement to the Springtown Police, appellant asked Teague, "Do you see any place where Kenneth Leon Davis, the only eyewitness to these things out there at Cox's Feed Store said, "I think he had a beard,, or perhaps he had a beard, or maybe he had a beard?" Teague answered, "I didn't see it on there, sir." Through his line of questioning, appellant sought to impeach the credibility of the State's eyewitness and its investigating officer. Appellant also sought to impeach the credibility of the affidavit, specifically the credibility of the identification of appellant as a suspect in the instant case.

When the State took Deputy Teague on re-direct, they sought to admit the affidavit into evidence. The appellant objected, stating that he had not questioned Teague about the entire affidavit. Appellant complained that the trial court should not admit the affidavit into evidence, because it contained hearsay. Appellant also asserted the State had been the party to open the

1. See Rule 107, Tex.R.Crim.Ev.

door on the subject of the affidavit of Deputy Teague.[2]

Appellant denied that he had opened the door for the State to gain admission of the affidavit. Appellant asserted he had tried to reveal from the true information in the affidavit that appellant was not the suspect described in the affidavit. Appellant said he only intended to impeach the credibility of Deputy Teague. Appellant stated that his question to Teague about Kenneth Davis being the only eyewitness to the murder was just a question and not testimony on the record. The State responded that appellant's impeachment of Deputy Teague and his affidavit allowed them to admit the rest of the affidavit. They relied on Art. 38.24, V.A.C.C.P. (repealed 1986), which sets out,

> When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given.

The State argued that since appellant had used the affidavit, including reading some of its contents to the witness, the State was entitled to admission of the whole affidavit. Appellant then requested the trial court to instruct the jury that an attorney's questions to a witness are not in evidence.

The trial court decided the affidavit would be admitted, and asked for some guidelines from the attorneys as to "how far you can go." Appellant thanked the trial court and requested only an instruction to the jury that the questions of counsel are not in evidence.

Appellant then urged several objections to admission of the affidavit. Appellant stated that admission flew in the face of the prohibition against hearsay. Appellant complained this ruling would leave him no recourse to impeach Deputy Teague. Appellant accused the State of "laying behind the log" during his cross-examination of Teague so they could gain admission of the affidavit. Appellant then summarized his objections: that the entire affidavit wasn't admissible in response to his cross-examination of Deputy Teague; and that the trial court solve the problem with a curative instruction that the questions of counsel are not in evidence as testimony.

In response to these objections, the trial court ruled in favor of the State. Appellant took exception to this ruling. He complained that there had been no ruling on Vicki Easterwood's marital status. Appellant again attacked the hearsay nature of the affidavit.

The trial court announced it would delete several items from the affidavit, most of which dealt with appellant's prior criminal history. Another deleted item was Vicki's account of the appellant telling her, "I killed a man." When the revised copy of the affidavit was admitted into evidence, appellant objected that it contained nothing but hearsay, and was not the best evidence. When the revised copy was read to the jury, appellant objected to the hearsay nature of all items in the affidavit. When appellant took Deputy Teague on re-cross examination, Teague admitted that all of the items in the affidavit were hearsay.

Normally, the recitals contained in a search warrant and return are hearsay and are not admissible before the jury. Their

2. Appellant is referring to Deputy Teague's testimony concerning the events of April 29, 1984. On direct examination by the State, Teague testified that he interviewed Vicki Easterwood on the 28th and 29th of April. Teague also testified that later on the 29th, he swore out an affidavit calling for the arrest of appellant. At no time on direct did Teague testify about any contents of the affidavit. Appellant was the first party to do that in this cause.

In all likelihood, Vicki Elaine Easterwood would have been called as a witness by the State, rendering this issue moot, if not for an unusual chain of events. Ms. Easterwood was interviewed by the police in April of 1984. She assisted them in the recovery of some of the evidence admitted at trial. She gave a written statement of the events surrounding the incident at the feed store. She testified before the grand jury which indicted the appellant in the instant cause. Then, some three months later, she married the appellant while he was incarcerated pending trial. The trial court never ruled on whether Ms. Easterwood would be allowed to testify at trial. The State and the defense never called her as a witness in the trial.

admission over objection is error. *Torres v. State*, 552 S.W.2d 821 (Tex.Cr.App. 1977).[3] The same would be true if the hearsay recitals were contained in an arrest warrant affidavit and complaint, as in the instant cause. Cases which relied on *Torres* discussed that it was error to admit hearsay testimony on the issue of probable cause when probable cause was not in issue. *Smith v. State*, 574 S.W.2d 555 (Tex. Cr.App.1978) and *Haynes v. State*, 567 S.W.2d 518 (Tex.Cr.App.1978).

In the instant case, appellant placed Deputy Teague's probable cause to arrest the appellant in issue by pointing out flaws in the description of the suspect in the affidavit. More important than this, the fact that appellant read part of the affidavit to Teague before the jury in an effort to impeach him permitted the State to request admission of the whole affidavit. Art. 38.-24, V.A.C.C.P. (repealed 1986); *Wintters v. State*, 616 S.W.2d 197 (Tex.Cr.App.1981).

In *Wintters*, this Court dealt with a situation where the defendant objected when the trial court admitted into evidence a police offense report. The defendant claimed the report was inadmissible because it contained hearsay and a reference to an extraneous offense. Relying on Art. 38.24, *supra*, this Court approved the trial court's decision to overrule appellant's objection to admission of the offense report.

This Court decided that it was "permissible for the State to offer into evidence those portions of the report on the same subject," *Wintters*, at 202. But the defendant's objections, that the report contained hearsay and mentioned an extraneous offense, were "directed toward the entire exhibit." The defendant "made no request that any portion of the report be deleted or covered which allegedly constitute hearsay or a reference to an extraneous offense." This Court held "that since portions of the report were admissible, appellant's objection directed toward the report as a whole was properly overruled," *Wintters*, at 202.

In *Brown v. State*, 692 S.W.2d 497 (Tex. Cr.App.1985), this Court again dealt with this problem. In *Brown*, the trial court admitted into evidence, during the punishment phase, a penitentiary packet which contained references to defendant's prior probation revocation. At trial, appellant made the following objections:

Your Honor, we would object to the page which I have just shown the court, which begins, 'The State of Texas, number 4326' on the grounds that it's immaterial and irrelevant in this particular hearing, and it's inadmissible for purposes of showing the kind of prior record in a punishment hearing.

After this objection was overruled, appellant's counsel further objected:

We would object that, throughout this exhibit there are references made to probation. We would object—they are contained in several pages throughout the exhibit. I believe the Court has seen the exhibit earlier today. We object to each and every reference in the exhibit to probation, and ask the court to strike the same out.

*Brown, supra.* This Court stated the defendant "did not specify the portions of the documents to which he objected. The objection was not, therefore, sufficient to preserve the issue for review." *Brown*, at 501.

In the instant case appellant objected that the affidavit contained hearsay, that the affidavit was not the best evidence, and that the affidavit contained the hearsay statements of Vicki Easterwood. These were objections directed toward the entire exhibit, as in *Wintters* and *Brown*. Appellant failed to request specific deletions of specific items in the affidavit and failed to specify which portions of the affidavit were unrelated subject matter, in spite of the opportunity which the trial court gave both parties to make deletions in the affidavit. Appellant preserved nothing for review. The trial court properly overruled his objections. *Brown, supra; Wintters, supra.*

**3.** In *Torres, supra,* this Court explained the affidavit upon which the search warrant was based

was not admitted into evidence.

*See also, Jasso v. State,* 699 S.W.2d 658 (Tex.App.—4th Dist.1985); *Biegajski v. State,* 653 S.W.2d 624 (Tex.App.—4th Dist. 1983); *Ballestero v. State,* 640 S.W.2d 423 (Tex.App.—4th Dist.1982); and *Edwards v. State,* 632 S.W.2d 908 (Tex.App.—14th Dist.1982). Point of error two is overruled. Since appellant merely re-urged every "fact, argument, authority and citation" in point of error two on point of error three, without adding anything else, point of error three is also overruled.

In his fifth, sixth and seventh points of error, appellant complains that the admission of three extraneous offenses at the guilt phase of his trial was erroneous. In point of error five, appellant attacks admission of the shooting of Jack Bellinoff on May 10, 1984. Appellant discusses in point of error six the admission of the taking of Bellinoff's car on the same date. In point of error seven appellant attacks the admission of his appearance carrying a handgun at Kathy Nievar's home on April 29, 1984.

In these points of error, appellant states that admission of the extraneous offenses was wrong because he should not be tried as a criminal, generally. In the instant case, appellant states the prejudicial impact of the extraneous offenses outweighed their probative value. The State responds that evidence of flight is relevant to a determination of guilt, and the fact that extraneous offenses are committed while in flight does not render inadmissible the evidence of flight.

■ It is wrong to try a defendant for being a criminal, generally. Before being admitted into evidence, an extraneous offense must be shown to have more probative value than prejudicial impact. *Albrecht v. State,* 486 S.W.2d 97 (Tex.Cr.App. 1972). The decision on admissibility lies within the discretion of the trial court. *Hernandez v. State,* 484 S.W.2d 754 (Tex. Cr.App.1972). In the instant case, the trial court admitted these three extraneous offenses over appellant's objections.

■ The State, in the instant case, urges admissibility because the extraneous offenses occurred while appellant was in flight. Evidence of flight is admissible as

a circumstance from which an inference of guilt may be drawn. *Valdez v. State,* 623 S.W.2d 317 (Tex.Cr.App.1981); and *Holloway v. State,* 525 S.W.2d 165 (Tex.Cr.App. 1975). Flight is no less relevant if it is only flight from custody or to avoid arrest. *Hunter v. State,* 530 S.W.2d 573 (Tex.Cr. App.1975); and *Fairris v. State,* 515 S.W.2d 921 (Tex.Cr.App.1974). From cases decided by this Court, it can be seen that a lapse of time between commission of the offense and the defendant's flight does not always adversely affect admissibility of the flight. *Thames v. State,* 453 S.W.2d 495 (Tex.Cr.App.1970); *Cox v. State,* 338 S.W.2d 711 (Tex.Cr.App.1960); and *Martinez v. State,* 140 S.W.2d 187 (Tex.Cr.App. 1940). *See also Reno v. State,* 649 S.W.2d 322 (Tex.App.—Tyler, 1983). The fact that extraneous offenses are committed while in flight does not render the evidence inadmissible. *Hunter, supra,* 530 S.W.2d at 575; and *Churchill v. State,* 167 Tex.Crim. 26, 317 S.W.2d 541 (1958). So long as the extraneous offenses are shown to be necessarily related circumstances of a defendant's flight, they may be admitted to the jury. *Arivette v. State,* 513 S.W.2d 857 (Tex.Cr.App.1974); and *Martinez, supra.*

■ In the instant case, the three extraneous offenses were admissible as necessarily related circumstances of the appellant's flight from arrest. The evidence showed that appellant and Vicki Easterwood were seen together in Graham in the white over red car on March 30th, six days before the murder of Cox. On April 28th, Deputy Teague arrived in Graham to begin interrogation of Vicki Easterwood at the Graham Police Department. Teague began searching for appellant on April 29th. On April 28th, late in the evening, appellant came to the home of Kathy Nievar. Appellant was tired and nervous. He requested that Nievar exchange her 1978 Buick for his white over red car. She agreed. She noticed that appellant had a pistol. Appellant called her on the night of April 29th and told Nievar that her 1978 Buick would be returned to her. Nievar did not see him on the 29th, and never saw him again. The appellant's nervous demeanor, his desire to

trade away the car which he allegedly used in the instant offense, and the fact that he had armed himself were all necessarily related circumstances showing the appellant's flight from arrest. This extraneous offense was admissible. *Hunter, supra;* and *Arivette, supra.* Point of error seven is overruled.

■ The evidence also showed that on May 10, 1984, appellant shot Jack Bellinoff several times and took Bellinoff's car without Bellinoff's permission. A few hours later, on May 10th, appellant took several hostages at the bank in Breckenridge. Appellant told the hostages that he was being pursued by Parker County and Young County authorities for an incident in Springtown in Parker County. Appellant also told the hostages that he had shot a person earlier that day and did not know if the victim was alive or dead. The facts that appellant attempted to kill Bellinoff in order to gain control of Bellinoff's car on the same day that he took hostages and told them he was fleeing from law enforcement authorities are all necessarily related circumstances proving appellant's flight from arrest. These two extraneous offenses were also admissible. *Hunter, supra;* and *Arivette, supra.* Points of error five and six are overruled.

■ In points of error eight and nine, appellant urges the State was barred from admitting evidence of two extraneous offenses, the shooting of Jack Bellinoff and the unauthorized use of Bellinoff's car, because both offenses had been dismissed in Throckmorton County under the Speedy Trial Act. In *Meshell v. State,* 739 S.W.2d 246 (Tex.Cr.App.1987), this Court decided the Speedy Trial Act violated Article II, Section 1 of the Texas Constitution. The Speedy Trial Act, including Art. 28.061, V.A.C.C.P., was void in its entirety. Later, this Court held that a prior dismissal under the Speedy Trial Act cannot be used as a bar to prosecution. *Ex parte Maddux,* 757 S.W.2d 737 (Tex.Cr.App.1988). Reliance on the Speedy Trial Act to bar the admission of an extraneous offense is misplaced. Points of error eight and nine are overruled.

In points of error ten through fifteen, appellant argues the State was barred on double jeopardy grounds from admitting the shooting of Bellinoff and the unauthorized use of Bellinoff's car. Appellant relies on the double jeopardy provisions of the United States Constitution, Art. I, Section 10 of the Texas Constitution, and Article 1.10, V.A.C.C.P. The basis for these six arguments is the pre-trial dismissal of the two extraneous offenses in Throckmorton County on speedy trial grounds. (see points of error eight and nine above). Appellant cites two cases from this Court in support of these arguments: *Stuart v. State,* 561 S.W.2d 181 (Tex.Cr.App.1978) and *Dedrick v. State,* 623 S.W.2d 332 (Tex.Cr.App.1981). ·

There are two problems with appellant's reliance on *Stuart* and *Dedrick.* Neither case has anything to do with extraneous offenses which had been previously dismissed under the Speedy Trial Act. Second, both cases involved the State's use of extraneous offenses which had already been presented to a jury for a determination of guilt or innocence. Also, *Dedrick* involved the doctrine of collateral estoppel and not double jeopardy. As a result, appellant's authorities are distinguishable from the instant case and do not support his points of error.

As for the merits of appellant's double jeopardy claims, jeopardy does not attach until a jury has been impaneled and sworn. *Crist v. Bretz,* 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) and *McClendon v. State,* 583 S.W.2d 777 (Tex.Cr.App.1979). Both of the extraneous offenses complained of here were dismissed pre-trial, so that in neither case was a jury impaneled and sworn. As such, the double jeopardy provisions of the United States Constitution, Article I, Section 10 of the Texas Constitution and Article 1.10, V.A.C.C.P., do not bar the admission of these two extraneous offenses. Points of error ten through fifteen are overruled.

■ In point of error sixteen, appellant asserts the trial court erred when it admitted into evidence the sawed-off shotgun which was recovered from the stock

tank. Appellant contends the shotgun could "in no way be connected to either the Appellant or the crime." He supports this with his statement that the record is "devoid of any legally admissible evidence" to make a connection between the shotgun and the appellant. Appellant cites no authority in support of his argument. He only relies on *"Chapman v. California,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967) and *Gutierrez v. State,* 628 S.W.2d 57 (Tex.Cr.App.1982)" for his proposition that this error could not have been harmless.

We do not agree that the trial court erred in the admission of the sawed-off shotgun. The weapon with which a crime was committed or alleged to have been committed is admissible in evidence. *Cole v. State,* 450 S.W.2d 661 (Tex.Cr.App.1970). An object, such as a weapon, offered in evidence should not be rejected "solely because it is not positively identified as the exact object that was connected with the crime." *Stanley v. State,* 606 S.W.2d 918 (Tex.Cr.App.1980); *Binyon v. State,* 545 S.W.2d 448 (Tex.Cr.App.1976); *Mullenix v. State,* 499 S.W.2d 330 (Tex.Cr.App.1973); and *Jackson v. State,* 486 S.W.2d 764 (Tex. Cr.App.1972). A lack of positive identification of an object, such as a weapon, connected with the alleged crime affects the weight of the object as evidence, rather than its admissibility. *Simmons v. State,* 622 S.W.2d 111 (Tex.Cr.App.1981); *Binyon, supra; Mullenix, supra;* and *Cole, supra.*

There is evidence in the record which establishes a sufficient connection between the shotgun, the appellant and the shooting of Gary Cox. Officer Martin testified that several days before the shooting, he saw the appellant and Vicki Easterwood together in the white over red car. Deputy Rice testified that in the morning hours preceding the murder, he saw the appellant and a female in the white over red car parked fifteen miles from Cox's Feed Store. Linda Morgan said on the morning of the murder she saw appellant drive into the parking lot of the feed store in his white over red car. Morgan saw there was a passenger with appellant. Ken Davis testified he saw the white over red car in the parking lot of the feed store. Davis said the man in the feed store was carrying a short barrel single-shot shotgun. As the white over red car fled the scene of the murder, Davis saw a blonde head rise up in the back seat of the car. Deputy Moody testified he was among the Parker County authorities who Vicki Easterwood led to a stock tank in Wise County. Moody was present when a shotgun was recovered from the stock tank. Moody identified the State's exhibit at trial as the sawed-off, .12 gauge, single action shotgun which was recovered. Dr. Perrwani testified it was capable of inflicting the fatal wounds to Gary Cox.

The State's evidence established a sufficient connection from the shotgun to the appellant and the instant offense. The lack of positive identification affected only the weight of the shotgun as evidence. *Simmons, supra;* and *Binyon, supra.* It was not error to admit the shotgun into evidence. Point of error sixteen is overruled.

In point of error seventeen, appellant argues the trial court erred by admitting into evidence Deputy Moody's testimony about Vicki Easterwood's gesture toward the stock tank. Appellant states that Moody's account of Easterwood's gesture was prejudicial hearsay.

The State responds the gesture was not assertive conduct which falls within the definition of hearsay. The State asserts it offered Moody's testimony only for the limited purpose of describing the circumstances of the police search of the stock tank. The State also claims the admission of the gesture could not have prejudiced appellant's case because there was other evidence, albeit mostly circumstantial, which proved the same fact.

During the direct examination of Deputy Moody, the following exchange took place:

Q. (State): All right. Tell the jury what you saw take place.

A. (Moody): She gestured toward a stock tank.

(Defense): Objection, Your Honor. I guess. Do we have a running objection to all of this hearsay?

The Court: Yes, Mr. Lane, you may have a running objection to all of this testimony.

Q. (State): You may answer.

A. (Moody): She made a throwing gesture toward the stock tank, stating that—

Q. (State): No, don't go into—

A. (Moody): Yes, sir.

Q. (State): Don't go into any hearsay recitations. Okay?

(Defense): Any hearsay recitation is the position of the defense, Your Honor. Acts are hearsay also, under the laws of the State of Texas.

The Court: Counsel, I will ask you, again, to phrase your objections in a manner that is intended for the Court. Thank you.

You may proceed, Mr. Smith

(Defense): I don't understand the Court's ruling, Your Honor.

The Court: Please proceed, Mr. Smith.

(State): Thank you, Your Honor.

Q. (State): After the gesture was made by Vickie Easterwood—

(Defense): Objection to counsel leading his witness, Your Honor.

The Court: Overruled.

Q. (State): Did you stay in that location, or did you leave?

A. (Moody): No, sir; we left, got back in the car and left.

We agree with the State that Moody's testimony revealed an incident of non-verbal, non-assertive conduct which cannot be defined as hearsay. Non-verbal conduct is to be considered hearsay only when it is an assertive substitute for verbal expression.

In the instant case, the testimony showed only that Deputy Moody was accompanied by Vicki Easterwood to a stock tank in Wise County. When they arrived at the tank, Vicki made a throwing gesture toward the tank. This was only an explanation of the circumstances which led to the recovery of the shotgun, thereby enabling the jury to realistically evaluate this exhibit. This was not an assertion by Vicki that she placed the shotgun in the tank, or that appellant put the shotgun in the tank. This was not a substitute for verbal expression where a declarant is asked a specific question and responds assertively to that question in a non-verbal manner.

These conclusions are supported by a comparison of the instant case to two contrasting decisions of this Court: *Nix v. State*, 150 Tex.Crim. 66, 198 S.W.2d 907 (Tex.Cr.App.1946); and *Graham v. State*, 643 S.W.2d 920 (Tex.Cr.App.1983).

In *Nix*, the defendant was tried for the rape of a young girl. This girl, "accompanied by the officers, went and pointed out to them the place where she had been criminally assaulted." On the next day, authorities returned to the spot, found tire tracks and made a plaster cast of them. *Nix*, at 909. This Court pointed out that there was no complaint that the girl or the officers testified as to what she told them. It was admissible for the State to prove that she pointed out a place where the police located physical evidence associated with the crime. *Nix* illustrates when non-verbal conduct is not an assertion by the declarant intended to substitute for a verbal expression. The girl was not asserting who raped her, or what the car looked like, or what time it happened, or any other fact necessary to be proven at trial in the case against the defendant.

In *Graham*, an investigator testified he showed the dying victim several photographs after asking her to identify the individual who had shot and robbed her. When the victim saw the defendant's photograph, the investigator testified she "made a shooting motion with her hand," *Graham, supra*, at 927. This non-verbal conduct was an assertion that appellant was the individual who shot her, substituting this non-verbal conduct for a spoken accusation and identification. It was error for the trial court in *Graham* to admit the investigator's testimony because that testimony reflected a non-verbal assertive act which was offered to prove the truth of the matter asserted, that the defendant shot and robbed the victim.[4] We find *Graham* does not control the instant case.

4. Compare to examples of verbal conduct which were held to be non-assertive and, therefore, not

In the instant case, the testimony of Moody was not offered as proof of the truth of the matter asserted, that appellant killed Gary Cox with a shotgun, or even that appellant threw the shotgun in the stock tank. It was offered as part of the circumstances of the recovery of physical evidence, specifically, the purpose the State had in searching the stock tank.[5] Point of error seventeen is overruled.

 We now return to the first point of error, and appellant's allegation the evidence was insufficient to prove he was guilty. The proper standard of review is that announced in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979): that the evidence must be viewed in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

The same method of review applies to circumstantial evidence cases, such as the instant case. *Carlsen v. State,* 654 S.W.2d 444, 450 (Tex.Cr.App.1983); and *Beardsley v. State,* 738 S.W.2d 681 (Tex.Cr.App.1987). This Court has held, "it is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved." *Boggess v. State* (No. 69,990, Tex.Cr.App., Feb. 1, 1989)

(reh. denied March, 1989). However, if the evidence "supports a reasonable inference other than the appellant's guilt, a finding of guilt beyond a reasonable doubt is not rational." *Boggess, supra.*

This Court has already extensively reviewed the facts of the instant case: the appellant and his automobile were seen in the parking lot of Cox's Feed Store at the time of the robbery and murder of Gary Cox; Ken Davis saw a man matching a general description of appellant holding a shotgun in the store immediately after the shooting of Gary Cox; appellant's car was seen leaving the parking lot; in the affidavit to appellant's arrest warrant, properly admitted as a result of appellant's insufficient and improper objection, Vicki Easterwood stated that she was with appellant at the time of the robbery and murder of Gary Cox, that he came out of the store with his shotgun, that he threw $200 at her to count, and that he got rid of the shotgun after leaving the area; a shotgun was recovered from a stock tank in Wise County; this shotgun was similar to the one described by Ken Davis and was described as capable of inflicting the fatal wound; and lastly, the appellant fled from the authorities seeking to arrest him.

 We find that the verdict of guilty was a reasonable hypothesis supported by a sufficiently incriminating set of circumstances within the facts proved at trial so

hearsay. The statements were held to not have been offered for the truth of the matter stated. *Roberts v. State,* 743 S.W.2d 708 (Tex.App.—14th Dist.1987) ("testimony was admitted not for its truth, but to establish the course of events and circumstances leading to the officers' approach to the appellant"); *Saunders v. State,* 687 S.W.2d 60 (Tex.App.—5th Dist.1985); and *Stewart v. State,* 640 S.W.2d 643 (Tex.App.—14th Dist.1982) (testimony admitted to indicate the purpose of the police surveillance of a specific location). Also, see the cases of *Compton v. State,* 607 S.W.2d 246 (Tex.Cr.App.1979), certiorari denied, 450 U.S. 997, 101 S.Ct. 1701, 68 L.Ed.2d 197 (1981), and *Silva v. State,* 635 S.W.2d 775 (Tex.App.—Corpus Christi, 1982). (In both cases, checks admitted into evidence were considered non-hearsay because they were not admitted to attest to the truth of any statements made on the checks, but only to show only they had been deposited and cashed).

5. The admission into evidence of non-verbal, non-assertive acts is now governed by Rule 801, Tex.R.Crim.Ev., which sets out the method for determining what constitutes hearsay. Rule 801, Official Comment (4), Tex.R.Crim.Ev. The non-verbal conduct of a person is excluded from the definition of hearsay in Rule 801, *supra,* "unless it is intended by the person as a substitute for verbal expression." 1A R. Ray, Texas Evidence, 3rd ed., Sec. 784 (Supp.1986), note 29.5, at 12. Also, in 33 Texas Pract. (Goode, Wellborn, & Sharlot); Section 801.2, at 550–555 (1988), the authors concluded that under Rule 801(a)-(d), Tex.R.Crim.Ev., non-verbal non-assertive conduct is admissible non-hearsay. The authors explain this was the intent of the Texas State Bar Committee when they drafted the hearsay definition of the Texas Rules.

that any rational trier of fact could conclude beyond a reasonable doubt that appellant committed the robbery and murder of Gary Cox. Point of error one is overruled.

In points of error nineteen and twenty, appellant argues he did not receive a fair trial as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, and as guaranteed by the due course of law clause of Article I, Section 19 of the Texas Constitution, respectively. In both points appellant summarizes his argument as follows: if this Court finds that no one point of error is ground for reversal in this case, then the cumulative effect of all the points of error as well as the entire record show that appellant was denied a fair trial. Appellant does not specifically refer to, or analyze, in his brief the parts of the record which support his argument.

In point of error nineteen, appellant cites only *Menzies v. Procunier*, 743 F.2d 281 (5th Cir.1984) as authority. He quotes dicta from *Menzies* that explains a determination of whether a defendant has received a fair trial must be determined from the "particular facts of each individual case." *Menzies*, at 288. In *Menzies*, the Court held that evidence of alleged threats against the complaining witness and evidence of an alleged scheme to suborn a witness, when combined with prosecutor's argument that implied defendant was responsible for both, worked together to deny the defendant a fundamentally fair trial. *Menzies*, *supra*. Distinguishable from the instant case on these facts, *Menzies* is not controlling. In point of error twenty, appellant cites no authority.

In these two points of error, appellant makes only vague, conclusory references to the record, and fails to analyze them at all. Appellant cites no authority to support his conclusory arguments. The right of appellate review does not extend to complaints which are not in accordance with this State's statutes relating to appellate review. *Phillips v. State*, 511 S.W.2d 22 (Tex.Cr.App.1974); Art. 40.09, V.A.C.C.P. (repealed 1986); and Rule 74, Tex.Cr.

App.R. Appellant has not preserved these points of error for review.

This Court has reviewed the entire record of the instant case, as well as the points of error appellant raises in his briefs. We do not agree with appellant that the record shows, on its face, that he received an unfair trial under either the 14th Amendment of the U.S. Constitution or Art. I, Sec. 19 of the Texas Constitution. Points of error nineteen and twenty are overruled.

The judgment is affirmed.

MILLER, J., concurs in the result reached in points of error 1, 2 and 4 and joins the remainder of the opinion.

DUNCAN and BERCHELMANN, JJ., concur in the result.

CLINTON, Judge, dissenting.

When it turns to appellant's fifth, sixth and seventh points of error, regarding admissibility of extraneous transactions, the majority conveniently deletes the first part of the two part test: whether evidence of extraneous transactions is relevant to a material issue in the case. *Williams v. State*, 662 S.W.2d 344 (Tex.Cr.App.1983); *Morgan v. State*, 692 S.W.2d 877 (Tex.Cr.App.1985). The material issues in any given case are those framed by the State's indictment on which the State has the burden of proof. *Rubio v. State*, 607 S.W.2d 498 (Tex.Cr.App.1980); (Clinton. J., concurring). "Flight" is not a talisman, any more than so-called "res gestae of the arrest." See *Maddox v. State*, 682 S.W.2d 563 (Tex.Cr.App.1985) (Clinton, J., concurring). Evidence of flight must somehow relate to a material issue. Cf. *Morgan v. State*, supra at 882, n. 7. The majority does not begin to establish a rational connection between the extraneous events and any material issue at trial. Instead the majority simply characterizes appellant's conduct as "flight," or a "necessarily related circumstance" of flight, a dubious proposition, and straightaway opines it is admissible.

That appellant desired to exchange his getaway car on April 28, three and a half weeks after the instant offense was com-

mitted, hardly shows a fear of imminent apprehension, at least absent evidence he believed he was being pursued at that time for the April 5 offense. It may be that the bare fact of appellant's possession of the getaway car, even three and a half weeks later, may have some incremental probative value toward establishing appellant's identity as the killer on April 5. But it certainly was not necessary to prove the possession of a pistol to further whatever legitimate inference may be gleaned from this exchange. That eleven days later, on May 10, appellant shot another man and took his car would seem to reflect more an attitude of imperviousness to the law than fear of lawful pursuit. Just because a suspect is at-large and committing further crimes does not necessarily show he is fleeing. "[F]light should show some act or instance of running away.... There must be some circumstance to show the accused is moving out or running." *Jones v. State*, 481 S.W.2d 900, at 902 (Tex.Cr.App.1972). See also *Riles v. State*, 557 S.W.2d 95 (Tex.Cr.App.1977). Only by linking them to statements made during yet another offense, the taking of hostages in a Breckenridge bank, does the State even tentatively identify the acts of May 10 as "flight" from an offense committed well over a month before in nearby Parker County. I am not satisfied the State has demonstrated the relevance of these extraneous transactions. "Flight should not be used merely as a vehicle to show proof of independent crimes when it tends to shed no light on any disputed issue in the case." *Woods v. State*, 480 S.W.2d 664, at 668 (Tex.Cr.App. 1972) (Onion, P.J., dissenting).

Ironically, the majority fails properly to implement that part of the test it *does* recognize: whether evidence of the extraneous transactions was more probative than prejudicial. *Williams v. State*, supra. Assuming *arguendo* that the evidence of appellant's extraneous offenses did conduce to establish "flight," the State had no compelling need to prove flight in this cause in order to obtain a conviction. As the majority's own recitation of the evidence shows, Op. at 863, the State's presen-

tation was more than sufficient to establish every element of its case without recourse to a demonstration, however dubious, of a consciousness of guilt. By my understanding of the law, see *Morgan v. State*, supra, at 879–80, nn. 2 & 3, the extraneous offenses admitted here were therefore far more prejudicial than probative. The trial court erred to admit them, and we cannot say beyond a reasonable doubt these errors did not contribute to appellant's conviction in this cause. Tex.R.App.Pro., Rule 81(b)(2).

With respect to appellant's point of error eighteen, I agree the record supports the trial court in granting the State's challenge for cause against venireman Boling, but disagree with the majority's characterization of him as a "vacillating" venireman. See *Perillo v. State*, 758 S.W.2d 567, 576, n. 10 (Tex.Cr.App.1988). In my view Boling's position was consistent throughout; he never "changed his mind." Op. at p. 851. He never denied being able to answer the second special issue. He did make clear, however, that his moral aversion to the death penalty might cause him to hold the State to what amounts to an impossible burden of proof. This, in combination with his earlier uncertainty whether he could set aside his opposition to the death penalty and honestly answer the questions, provides adequate support for the trial court's action in granting the state's challenge for cause. But I fail to perceive how Boling "wavered." Op. at 851. Moreover, the majority places undue weight on Boling's own affirmation that he would likely be "substantially impaired." That is a bit like allowing the patient to diagnose his own ailment. In context of our capital scheme this phrase has acquired a particularized meaning, see *Hernandez v. State*, 757 S.W.2d 744 (Tex.Cr.App.1988). Whether a venireman is in fact "substantially impaired" is an issue for the trial court to decide.

To the extent it suggests our review of sufficiency of evidence is contingent upon finding challenged portions of that evidence to have been properly admitted, Op. at 855, the majority misleads. See *Osban*

*v. State,* 726 S.W.2d 107, at 111–12 (Tex.Cr. App.1986), and cases cited there.

For these and other reasons I respectfully dissent.