# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00147-CR

---

**Kenneth Daniel Carver, III, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 22ND DISTRICT COURT OF HAYS COUNTY
### NO. CR-21-1320-A, THE HONORABLE R. BRUCE BOYER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Through four issues, Appellant Kenneth Daniel Carver, III, challenges his convictions for two counts of aggravated sexual assault of a child and two counts of indecency with a child by sexual contact. *See* Tex. Penal Code §§ 21.11, 22.021(a)(2)(B). Appellant was charged with committing two offenses of aggravated sexual assault (Counts I–II) and one offense of indecency with a child (Count III) against one of his twin daughters (Older Twin)[1] and one offense of indecency with a child (Count IV) against his other twin daughter (Younger Twin). In his first issue, Appellant contends that his convictions for both Count I and Count III violate his protection against double jeopardy because indecency with a child is a lesser included offense of aggravated sexual assault. Because the four charges allege separate acts of prohibited behavior,

---

[1] Because the twins are minors and Appellant's half-sisters were minors at the time of the offenses, we will refer to them and their family members based on their relationship to each other to protect their privacy. *See* Tex. R. App. P. 9.10(a)(3).

we conclude that his double-jeopardy right was not violated by his convictions. In his second through fourth issues, Appellant contends that the trial court erred when it admitted the following exhibits as evidence: a partially redacted video recording of a detective's body-camera footage from an interview with Appellant at his home; extraneous-offense testimony from Appellant's two half-sisters, who testified that Appellant sexually abused them when all three of them were children; and photos extracted from video footage of the twins' forensic interviews. For the reasons detailed below, we conclude that the trial court did not abuse its discretion when it admitted the complained-of evidence. Ultimately, we affirm the trial court's judgments of conviction.

## BACKGROUND

At trial, the twins' mother (Mother), testified that she and Appellant were previously in a relationship and had three daughters together, including the twins. Mother was fourteen or fifteen years old when the twins were born. Although none of the witnesses knew Appellant's exact age or birth date, based on the combined testimony of all the witnesses, Appellant was about sixteen years old when the twins were born. The twins testified that they were ten-years old at the time of trial.

Mother testified that she and Appellant broke up in 2015. She testified that in 2020, Appellant lived with his mother (Grandmother) and did not see the girls often—about once or twice every two months—and that she would arrange visitation with Grandmother. Mother testified that the last two times the twins stayed with Appellant were in September and October 2020. The twins were seven years old at the time of those two visits.

Mother testified that in March 2021, Older Twin told her that Appellant had done something to her that required a private conversation. Older Twin told Mother that Appellant had "grabbed her by her waist and pulled her into him, and she could feel his private part on her bottom;" "had kissed her with his tongue in her mouth;" "had touched her private part" with his hand; had gotten "on top of her with her legs open where she could feel his private part on hers;" and "had covered her mouth and asked her not to say anything." Older Twin told Mother that this happened the second-to-last time she had seen her father. Mother testified that she believed Older Twin was referencing the September 2020 visit, which was an overnight visit. Mother testified that based on her conversations with Grandmother, it was her understanding that when her daughters visited their father, they either slept with Grandmother, on the floor in Appellant's room, or with Appellant in his bed.

Mother testified that after hearing what Older Twin told her, she sent Older Twin to bed and asked Younger Twin to come talk. Mother asked Younger Twin if anybody was hurting or touching her or making her feel uncomfortable. Younger Twin answered that her dad, Appellant, made her uncomfortable when "he would kiss her with his mouth open and give her uncomfortable looks." Younger Twin told Mother that Appellant had "opened her legs and got on top of her" and "touched her with his hand above her private part." Mother testified that she immediately called the police to report what the twins had told her.

Detective Robert Elrod testified that he was assigned to investigate the allegations of sexual abuse against Appellant. Detective Elrod interviewed Appellant at Grandmother's house. Redacted body-cam footage of that interview was admitted into evidence and portions were played for the jury during Detective Elrod's testimony.

3

Detective Elrod testified that one thing that stood out to him during the interview was that when he told Appellant that he was there to discuss a sexual assault case, Appellant immediately responded, "What the f***? I've been here the whole time." Detective Elrod explained that he found this interesting because he had not yet told Appellant that he was a suspect or the person accused of the offense. Detective Elrod testified that typically suspects will ask about details of the crime that they are suspected of committing and that it stood out to him that Appellant did not. On cross-examination, Detective Elrod agreed that he told Appellant he was there "investigating a sexual assault . . . and your name has been mentioned" and that Appellant asked, "Who?" He also stated that later in the interview, Appellant asked him what his daughters had said he did. Detective Elrod further explained that in his experience parents usually get angry when they hear that their child has been abused and ask questions like, "Who did that" and "What happened to them," but that Appellant did not ask any questions like those.

Detective Elrod testified that another aspect of the interview that stood out to him was Appellant's inconsistent statements throughout the interview regarding his memory of when he last saw his children. Initially, Appellant told the detective that he could not remember the last time he saw his daughters but then started remembering details, including where the children slept the last time they had visited him. During the interview, Appellant showed the detective where the twins had slept, which was in his room on the ground next to his bed.

Detective Elrod testified that he had concerns about the way Appellant was describing the type of physical contact he had with his daughters throughout the interview. The detective explained that he was concerned when Appellant "was talking about kissing them all over" and then used the words "boom, boom" while explaining himself. On the recording, Appellant explained that he would "kiss them all over" but denied ever using his tongue when

doing so. Later in the interview, when asked if there could have been a time when something happened accidentally, Appellant told Detective Elrod, "I was playing with her and tickling her and boom, boom, you know, so what?" When Detective Elrod asked Appellant what "boom, boom" means, Appellant responded, "et cetera."

During the recorded interview, Appellant admitted that he used drugs, including methamphetamine, but denied using drugs while his daughters were visiting him. Detective Elrod told Appellant that drugs can stay in the system for days and suggested that maybe he was still under the effects of drugs at the time of the incident and did not remember. Appellant responded, "Kissing them, yeah, possibility, probably, you're saying with my tongue and all this stuff and boom boom, yeah probably boom boom, when it comes to that, when it comes to doing stuff like that, possibility." Detective Elrod asked Appellant if he was saying it was a possibility that he kissed his daughters with his tongue, and Appellant responded, "I mean if that's what they are saying, I don't remember."

On the recording, Appellant told Detective Elrod, "I can have any girl that I f***ing want, why would I choose to touch a little girl?" Detective Elrod testified that this kind of statement is a "red flag" that he had been trained to look for because it is a "deflector." He explained that use of deflectors is not definitive proof that the person committed the crime, but it is a "clue" that he was trained to watch for. Also on the recording, Appellant made comments about how he believed that victims would come forward right away if something really happened. Detective Elrod explained at trial that in his experience children do not usually outcry immediately because they are afraid or do not understand that what happened was wrong. The detective identified comments regarding how long it took for the victim to outcry as another "deflection" he was trained to look for when conducting interviews.

5

On cross-examination, Detective Elrod confirmed that he had watched both twins' forensic interviews. He confirmed that the twins were asked if they had ever been shown movies or photos of naked people and that they said an eight- or nine-year-old cousin had shown them that. Detective Elrod confirmed that during the interview, Younger Twin stated that she thought the cousin had touched her. Detective Elrod explained that he did not believe the twins' allegations were the result of being shown porn because it did not explain the level of knowledge about certain sexual acts that both twins had when describing what happened to them.

Maggie Ortuno testified that she was the forensic interviewer who spoke to the twins in March 2021 after their outcries to their mother. She testified to the process of the forensic interview and her professional experience. She explained what she does to reduce suggestibility of the child and to determine whether they have been coached. Still frames from the interview video depicting the twins showing the interviewer what happened using hand gestures and dolls were admitted into evidence over defense counsel's objection. Ortuno testified that the twins communicated well, used age-appropriate terminology when describing body parts, and provided sensory details. She testified that in her experience it is very common to have a delayed disclosure of child sexual abuse. The video of Younger Twin's forensic interview was admitted by the court and played for the jury.

Noella Hill testified that she was the nurse who examined the twins after their forensic interview. The medical report that she prepared during her interview of Older Twin was admitted in evidence over defense counsel's objection.

Older Twin, who was ten-years old at the time of trial, testified that something bad happened twice while she was at her grandma's house visiting her dad, Appellant. The first incident occurred at night while she was sleeping. She and her two sisters were sleeping on

6

blankets on the ground in Appellant's bedroom and her two stepsisters and Appellant were in his bed in the same room. Older Twin woke up to Appellant looking at her from behind her. He wrapped his arms around her and pulled her into him, and she felt his "private part" on her "bottom." She testified that he held her like that and stayed still but "started squeezing [her] tighter." She could not remember anything else from that incident.

Older Twin testified that the next night she was going to sleep when the bad thing happened the second time. She testified that her two sisters were asleep next to her on the ground and that Appellant was lying on the ground as well. She could not remember whether her stepsisters were also in the room that night. She testified that this time was similar to the first because Appellant wrapped his arms around her, pulled her into him, and squeezed her tight against him. However, this time she was facing him and her "private part was touching his." She testified that she knew it was his private part because he was only wearing boxers and because she was wearing thin shorts. He then started "kissing [her] weird" by "putting his tongue inside [her] mouth." After Appellant kissed Older Twin, she turned around, so she was facing away from Appellant. He wrapped his hands around her stomach, pulled her close to him, and put his hands in between her shorts and her underwear. She testified that he did that for what felt like a long time and after it was over she stayed awake awhile because she was scared, uncomfortable, and did not want it to happen again.

Older Twin testified that after both incidents, Appellant told her not to tell anyone what had happened. Older Twin testified that her "private part" and her "bottom" are used "to go to the restroom" and used to "pee" and to "poop," respectively. She did not know what boys used their private part for. Older Twin testified that she did not tell her mom, or anyone else, right away because she forgot it happened and later remembered and told her mom. She also

7

testified that a boy at school had made her feel uncomfortable in between the two incidents occurring and when she told her mom, that she told her mom about it, and that she did not get in trouble. Older Twin testified that their cousin did not show her pictures or videos of naked people.

Younger Twin testified that when she was six-years old, Appellant did something that made her uncomfortable while she was visiting him at her grandmother's house. She explained that one night she was in Appellant's bed with him and her two stepsisters, who were four-years old and one-year old at that time. Appellant was lying behind her on his side facing her, and she was facing away from him on her side. Appellant's hand touched her "middle part." She testified that she uses her "middle part" to go the restroom and to pee. She could feel his finger rubbing on her middle part under her clothes. She testified that her cousin had shown her movies of naked people and that she had told her mom about it. Younger Twin testified that she did not remember telling the forensic interviewer that her cousin had touched her and did not remember whether it had happened.

The State presented extraneous-offense evidence through the testimony of Appellant's two younger half-sisters (Younger Half-Sister and Youngest Half-Sister). Appellant objected, and the trial court held a hearing outside the presence of the jury and overruled the objections. According to the step-sisters' testimony, Appellant was between the ages of about eight and twenty-one when he was engaging in the extraneous offenses that they testified about.

Younger Half-Sister testified that she lived with her grandparents "on and off" as a kid and so did Appellant. When she was seven or eight, Appellant groped her "in the vagina area" multiple times by grabbing, touching, and rubbing her vagina and legs. When she was twelve or thirteen it progressed to "intercourse," which she described as Appellant's penis being

8

inserted into her vagina. It stopped when she moved back with her mom at age fourteen. She testified that Appellant would use a penny to unlock the shower door while she was taking a shower to have intercourse with her. She testified that as she got older, she realized what was happening because she had learned what intercourse was and understood what he was doing to her, and she was afraid. She testified that she would be in shock and "freeze" during these incidents. At some point she told her siblings, then her mother, then the police. She was thirteen or fourteen when her mother reported it to the police. During an interview about the abuse, she "held back" and did not say that it was Appellant who did it. She explained at trial that she held back because her grandparents told her she and her mother were ruining the family, that the grandparents would hire a good lawyer for Appellant, and that he could get the twins taken away from him if she identified him as the perpetrator. She testified that the twins were about six months old at the time she reported the abuse to the police.

Youngest Half-Sister testified that she is one year younger than her sister and two or three years younger than Appellant. She lived in the same house as Appellant—with their grandparents—for the majority of her childhood. When she was in elementary school, Appellant started touching her inappropriately, which she explained meant he would put his fingers inside her and kiss her on her neck, face, and private parts. She testified that this occurred "quite frequently." She testified that whenever Appellant would touch her, she would be "still" and "frozen." She explained that although her earliest memory of this happening was when she was in the first grade, she knew it had happened before that. When asked on cross-examination if any of it could be characterized as "innocent touching," she responded "no."

Youngest Half-Sister testified that when she was in about the fifth grade, the touching escalated to intercourse, which she described as Appellant's penis being inside her.

9

The intercourse would happen "quite often" and "when he came home late messed up." This continued even after Mother and the twins were living there too. She remembered asking Appellant to stop, but he did not. In response to being asked if she did anything other than ask him to stop to try to prevent it, she testified that she would lock the door to her room but that he would come in through the window, which was broken. She testified that the intercourse stopped a short time before she moved out of her grandparents' house because Appellant stopped being around the house as much. This was when she was in high school, and the twins were about five years old.

She testified that she never told the twins about what Appellant did to her. She explained that she never told her family or the police what happened because she felt ashamed. When she was seventeen or eighteen years old, she told a mental health provider during a therapy session, and she was admitted to a hospital as a result.

After the State closed, the defense offered, and the trial court admitted, two recordings of conversations between an interviewer from the Department of Family and Protective Services and each twin. The two interviews were part of a separate investigation unrelated to the charges at issue in this case.[2] The recordings were made on October 23, 2020, when the twins were seven years old, after the last time the twins visited Appellant and before their outcries to Mother. In both interviews the twins were asked "safety questions." They both answered that they knew what their "private parts" were; that no one had ever tried to touch or look at them there; and that if someone did, they would tell their mom. Older Twin was asked if her dad was "nice" or "mean," and she responded "nice."

---

[2] There was no testimony about what the subject of that unrelated investigation was.

10

After hearing all the evidence, the jury found Appellant guilty as charged of all four counts. After the punishment phase, the trial court sentenced Appellant to twenty-years' imprisonment for each aggravated assault conviction to run concurrent to each other and ten-years' imprisonment for each indecency with a child conviction to run concurrent to each other but consecutive to the two twenty-years sentences. *See* Tex. Penal Code §§ 21.11(d), 22.021(e). Appellant appealed.

**DOUBLE JEOPARDY**

In his first issue, Appellant contends that his convictions for both Count I and Count III violate his protection against double jeopardy. As charged, Count I alleged that Appellant committed aggravated sexual assault against Older Twin when he caused his sex organ to contact her sex organ. As charged, Count III alleged that Appellant committed indecency with a child against Older Twin by touching her genitals with his hand. Appellant contends that Count III is a lesser-included offense of Count I and thus asserts that Count III must be dismissed because his convictions for both counts violate the constitutional protection against double jeopardy.

"The Fifth Amendment guarantee against double jeopardy protects against multiple punishments for the same offense." *Price v. State*, 434 S.W.3d 601, 609 (Tex. Crim. App. 2014) (cleaned up). A violation can occur "when a person is punished for: (1) the same primary offense twice, once for the basic conduct, and a second time for that same conduct plus more" or (2) the same criminal act twice under two distinct statutes "when the legislature intended the conduct to be punished only once[.]" *Id.* When considering double jeopardy issues

11

in sexual assault cases, "[s]eparate criminal acts committed during a single sexual encounter may be punished separately." *Aekins v. State*, 447 S.W.3d 270, 277–78 (Tex. Crim. App. 2014).

Here, the crux of Appellant's contention is his assertion that the Count III indecency offense "did not occur outside of the aggravated sexual assault of a child offense." We disagree. *See Hernandez v. State*, 631 S.W.3d 120, 124 (Tex. Crim. App. 2021) (explaining that "[s]eparate offenses are not included offenses"). Here, Older Twin testified that on the second night, Appellant grabbed her and pulled her towards him with her facing him, which caused her "private part" to touch his "private part." This was the offense alleged in Count I. Older Twin testified that after this face-to-face touching of their "private parts," she turned around so that she was then facing away from Appellant. She testified that he put his hand in her shorts on top of her underwear. This was the offense alleged in Count III. Because in the context of sex offenses, "different body parts mean different crimes," *id.*, Appellant's separate acts of prohibited contact are separate offenses. We overrule Appellant's first issue.

## EVIDENTIARY CHALLENGES

In his second through fourth issues, Appellant contends that the trial court erred when it admitted various pieces of evidence and testimony.

### *Standard of Review*

We review a trial court's ruling regarding the admission or exclusion of evidence for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Under that standard, a trial court's ruling will be deemed an abuse of discretion only if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d

435, 439 (Tex. Crim. App. 2005). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In addition, an appellate court reviews the trial court's ruling in light of the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

### Body-Camera Footage

At trial, defense counsel filed written objections to the video depicting Detective Elrod's interview of Appellant. Defense counsel objected to the inclusion of specific statements made by Detective Elrod during that interview based on the Rules of Evidence 403 and 702. During the hearing, defense counsel stated that her objections did not include a hearsay objection. After a hearing, the trial court ruled on each objected-to statement. The statements that the trial court ruled were inadmissible were redacted from the video's audio, and the redacted version was played for the jury. In his second issue on appeal, Appellant complains of specific statements that were allowed to stay audible on the video recording over defense counsel's objections. Those statements are:

> "Well, they're your daughters man, they're pretty smart, they're very intelligent, they're very articulate, do you know what that means? Articulate . . . they can communicate very well, so why would they have any reason to lie about this?"

> "It's possible, in my opinion, and what I think is possible, is that something happened, and maybe you don't remember, or you didn't mean for it to happen, right, and you didn't mean for whatever touching happened to even take place, but it did. . . ."

"So they're lying?  Are they lying about touching them that way?  Are your girls lying?  Your 8-year-old girls are lying?  Why would they lie about it?  What would they possibly have to gain by lying?"

"You want me to believe you off your 'this and that,' but you don't want me to believe them off of their 'this and that?'"

"Then be a man, Kenneth, I don't think your girls are lying."

"The problem that I'm facing, right, is you have everything to lose by lying, right?  You have every reason to sit here and lie.  They have nothing to gain by lying, they don't get anything, you know, they don't get a prize, they don't get anything for making this up."

"Now it's time to be that father.  It's time for you to step up, be a man for your kids.  It's time to be a father.  And the best way you can do that—to honor those two little girls—is to completely be honest and tell the truth as to what happened.  Like I said, they have nothing to gain from lying."

"I think the truth is going to be on their side."

"What about your girls?  What about your daughters?  Are they gonna be alright?  They are your daughters whether you want to accept it or not.  You created them, you are part of that creation.  And they are wonderful, wonderful girls."

Regarding all of the complained-of statements, Appellant contends on appeal that the trial court should have excluded them as inadmissible hearsay or under Rules 403 or 702.

*Hearsay*

The State contends that Appellant failed to preserve his hearsay complaint.  We agree.  To preserve a complaint for appellate review, there must ordinarily be a timely, specific objection and a ruling by the trial court.  Tex. R. App. P. 33.1(a).  Appellate courts should not address the merits of an issue that has not been preserved for appellate consideration.  *See Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012).  Here, defense counsel

14

specifically clarified to the trial court that she was not making a hearsay objection. Thus, we will not address this sub-issue. *See id.*

## *Rule 702*

Appellant contends that the detective's complained-of statements should have been excluded because they were inadmissible opinion testimony regarding the truthfulness of the twins' allegations that Appellant sexually abused them. Expert testimony that assists the jury in determining an ultimate fact is admissible, but expert testimony that decides an issue of ultimate fact for the jury is not admissible. *See* Tex. R. Evid. 702; *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993). Direct opinion testimony on the truthfulness of a child victim's outcry or testimony is not admissible. *See Yount*, 872 S.W.2d at 708; *Flores v. State*, 513 S.W.3d 146, 164–65 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Further, whether expert or lay person testimony, a witness may not offer opinion testimony about the victim's truthfulness as to specific allegations. *Sandoval v. State*, 409 S.W.3d 259, 292 (Tex. App.—Austin 2013, no pet.).

Assuming without deciding that the officer's statements constitute opinion testimony regarding the twins' truthfulness and thus that it was error to not redact the complained-of statements from the recorded interview, we will address whether any error was harmful. The erroneous admission of this type of evidence is non-constitutional error. *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001). We must disregard the error unless it affected Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). An error affects a substantial right "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). An

appellate court "will not overturn a criminal conviction for non-constitutional error if [it], after examining the record as a whole, has fair assurance that the error did not influence the jury, or influenced the jury only slightly." *Schutz*, 63 S.W.3d at 444. When conducting our review, we "should consider everything in the record, including testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the error and its relationship to other evidence." *Id.* Additionally, we "may consider the trial court's instructions to the jury, the theories of the case that the State and defendant have espoused, arguments to the jury and relevant voir dire." *Id.* at 444–45. Here, the potential danger posed by any erroneous admission of Detective Elrod's statements as a comment on the twins' credibility was that the jury could have allowed that testimony to supplant its decision. *See id.* at 445.

First, we note that the statements were not presented as direct testimony. In other words, the detective did not repeat the complained-of statements at trial. Rather, they were made, and presented to the jury, through the video recording of the conversation between Detective Elrod and Appellant that occurred during the investigation of the twins' allegations of sexual abuse against Appellant. During the hearing regarding the admissibility of these recorded statements, the State argued to the trial court that the detective's statements should be allowed to remain unredacted in the video because the State was not offering them for the purpose of proving their truth. The State argued that the detective's statements provided needed context to Appellant's responses. The inclusion of Appellant's responses in the video was not objected to, and his responses were not redacted from the video. Additionally, the State also characterized the detective's complained-of statements as interrogation techniques and argued to the trial court that police are allowed to lie to suspects as further support for its argument that these statements were not being offered for their truth. During her closing argument, defense counsel told the jury

16

not to believe anything Detective Elrod said in the interview with Appellant because the detective was only there to get a confession.

Detective Elrod testified that after interviewing Appellant, he made the decision to obtain the arrest warrant for Appellant for the charged offenses. The jury could have inferred Detective Elrod's opinion of the twins' truthfulness independently of his statements to Appellant during the interview. *Cf. Flores*, 513 S.W.3d at 169–70 (concluding in context of issue challenging denial of defendant's motion for mistrial that evidence was "not particularly prejudicial" because although "the officer's testimony essentially expressed his opinion that complainant was not fabricating the allegations—an inadmissible opinion as to complainant's truthfulness—the jury likely discerned from the officer's other statements and actions that he believed complainant").

Detective Elrod also testified that he never interviewed the twins himself but that he had viewed their forensic interviews and read the medical reports. A recording of one of the twins' interviews and the medical report for the other twin were admitted into evidence. Further, as detailed above, the twins both testified regarding their allegations of abuse against Appellant. Mother testified about the twins' outcries to her and testified that after hearing the outcries she immediately called the police. Thus, the jurors had other evidence on which to base their determinations of the twins' credibility and Appellant's guilt. *See King*, 953 S.W.2d at 273 (acknowledging that potential harm of erroneously admitted evidence may be "defused by properly admitted evidence").

During voir dire, the trial court told the panel members that the jury is "the judge of the weight and credibility of the evidence and the testimony of the witnesses, and no one, not even the judge, is permitted to try to influence you in your evaluation." The court's charge

stated to the jury members, "You judge the believability of the witnesses and the weight to give to their testimony." During closing argument, the State emphasized that the jury members were "the ones who get to judge the credibility of each of the people that testified, including those victims." These instructions to the jury by both the State and the trial court weigh in favor of concluding that any error was harmless. *See Wilson v. State*, 90 S.W.3d 391, 394 (Tex. App.—Dallas 2002, no pet.) (concluding that error of admitting expert testimony regarding truthfulness of victims was harmless when trial court instructed jurors "that they were the exclusive judges of a witness's credibility" and State emphasized in closing argument their role as judge of witness credibility).

Considering the record as a whole, including all the evidence presented, the nature of the evidence supporting the verdict, the character of the error and its relationship to other evidence, the instructions of the court, and closing argument, we are left with the fair assurance that any trial court error regarding the admission of the detective's recorded statements did not influence the jury or influenced the jury only slightly. *See Schutz*, 63 S.W.3d at 444. Having concluded that to the extent the trial court erred, the error was harmless, we overrule this sub-issue of Appellant's second issue.

*Rule 403*

Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. The rule envisions exclusion of

18

evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (footnotes and internal quotation marks omitted). Accordingly, "the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial. Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (internal citation omitted).

"Probative value" means more than relevance; rather, it "refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). "Unfair prejudice" refers to a "tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*; *see Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). In conducting a Rule 403 analysis, the trial court must balance the claimed probative force of the proffered evidence along with the proponent's need for the evidence against:

> (1) any tendency of the evidence to suggest that the case would be decided on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016) (citing *Gigliobianco*, 210 S.W.3d at 641–42). These factors may blend together in practice. *Gigliobianco*, 210 S.W.3d at 642. The

19

court's balancing test need not be performed on the record.  *See Hitt v. State*, 53 S.W.3d 697, 706 (Tex. App.—Austin 2001, pet. ref'd).  Reviewing courts should afford trial courts a high level of deference regarding admissibility determinations under Rule 403.  *See Brickley v. State*, 623 S.W.3d 68, 79–80 (Tex. App.—Austin 2021, pet. ref'd).

*Inherent Probative Value*

As discussed above, the State introduced the complained-of statements as context so that the jury could understand Appellant's answers and responses to the detective's questions, hypotheticals, and interrogation techniques.  Appellant contends that the detective's statements "had no probative value as their effect was cumulative" and that they were "introduced merely to inflame the jury."  We understand this contention to be based on Appellant's assertion that these statements were admitted as substantive evidence that the detective believed the twins' allegations of sexual abuse.  However, as explained above, it would have been reasonable for the trial court to view these statements as providing context to Appellant's responses separate from the truth of the matter asserted in them.

These statements had strong probative value because they added context to Appellant's own statements made to Detective Elrod while being interviewed regarding the twins' allegations against him that were the subject of the trial.  Appellant's responses during that interview were, at times, rambling in nature and difficult to understand, even in context.  The statements that were admitted over objection were ones that the trial court determined were not direct commentary on the truthfulness of the twins' allegations.  Further, they provided needed context for the jury to be able to determine the meaning of Appellant's responses, which were important for determining his culpability for the charged offenses.  This factor weighs in favor of

20

admission. *See King v. State*, 189 S.W.3d 347, 356 (Tex. App.—Fort Worth 2006, no pet.) (concluding "that the trial court's decision to admit the same transaction contextual evidence was within the zone of reasonable disagreement"); *Greene v. State*, 287 S.W.3d 277, 284 (Tex. App.—Eastland 2009, pet. ref'd) (same).

*State's Need for Evidence*

Appellant contends that "[t]he supposed probative value did not require the introduction of [] inflammatory hearsay in order to be presented to the jury." We understand Appellant to be asserting that the State had little need for this evidence other than inflaming the jury. Appellant does not explain on appeal, and no suggestion was made at trial, for how the contextual statements could have been presented to the jury in a less inflammatory manner. Notably, the trial court excluded some statements that it believed to be direct commentary on the truthfulness of the allegations and left in the ones it believed to be contextual. As noted above, Appellant's statements to Detective Elrod were not always easy to follow. Including the context of what question the Appellant was answering added needed clarity.

In deciding whether the evidence was needed by the State, we consider whether the proponent had other evidence to establish the fact of consequence, how strong the other evidence was, and whether the "fact of consequence related to an issue that is in dispute." *See Erazo v. State*, 144 S.W.3d 487, 495–96 (Tex. Crim. App. 2004). Because of the nature of the detective's statements—providing context within a conversation—there was no other evidence that the State could have used. Further, the context was important for the jury to be able to determine Appellant's consciousness of guilt when faced with the detective's questions. *Cf. James v. State*, 623 S.W.3d 533, 548 (Tex. App.—Fort Worth 2021, no pet.) (noting that State's

21

need for evidence was great where there was limited evidence to prove fact at issue). This factor weighs in favor of admission.

*Tendency of Evidence to Suggest Decision on an Improper Basis*

Here, the potential improper basis that the jury could consider this evidence for would be as a direct comment on the truthfulness of the twins' allegations. *See* Tex. R. Evid. 702; *Yount*, 872 S.W.2d at 708. However, as discussed above, this evidence was not presented for that purpose and to the extent it was considered as such by the jurors, there was significant mitigating circumstances—such as the trial court and prosecutor instructing the jury to make their own credibility determinations. *Cf. Beam v. State*, 447 S.W.3d 401, 405 (Tex. App.— Houston [14th Dist.] 2014, no pet.) (noting in context of character conformity evidence that "impermissible inference can be minimized through a limiting instruction"). Thus, we conclude that this factor is at least neutral.

*Tendency of Evidence to Be Given Undue Weight by Jury*

This factor concerns "a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Gigliobianco*, 210 S.W.3d at 641 (internal citation omitted); *see Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd). Here, the evidence was not scientific or technical and pertained to matters including Appellant's credibility regarding his insistence to Detective Elrod that he would not do the things he was being accused of doing, which could be easily comprehended by laypeople. *See Gaytan*, 331 S.W.3d at 228; *Deggs v. State*, 646 S.W.3d 916, 925 (Tex. App.— Waco 2022, pet. ref'd). This factor weighs in favor of admission.

22

*Likelihood that Evidence Will Be Too Time-Consuming or Repetitive*

This factor concerns whether "the jury would be distracted from consideration of the charged offense." *Mechler*, 153 S.W.3d at 441. Here, the presentation of evidence during the guilt-innocence portion of the trial covered about 335 pages and took two days. The nine complained-of statements (or small grouping of related statements) were embedded within an approximately forty-five-minute conversation that was played for the jury. The detective's testimony regarding his interview with Appellant covered about thirty-three pages. *Cf. Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (factor weighed in favor of admission where extraneous-offense testimony amounted to "less than one-fifth" of trial testimony). This factor weighs in favor of admission. *See Hernandez v. State*, 203 S.W.3d 477, 481 (Tex. App.—Waco 2006, pet. ref'd) (upholding admissibility of evidence over Rule 403 objection that took up 50 pages during two-day trial).

*Summary of Factors*

Based on the applicable standard of review and considering that none of the factors weigh in favor of exclusion, we cannot conclude that the trial court abused its discretion by overruling Appellant's Rule 403 objection. *See Brickley*, 623 S.W.3d at 83 (upholding trial court's ruling denying Rule 403 objection when majority of factors weighed in favor of admission of evidence). We overrule this sub-issue of Appellant's second issue.

Having overruled both of Appellant's preserved sub-issues, we overrule his second issue.

23

*Extraneous Offenses*

In his third issue on appeal, Appellant contends that the trial court erred when it admitted the extraneous-offense testimony from his two half-sisters. He contends that it was not admissible under Article 38.37 of the Code of Criminal Procedure and, alternatively, should have been excluded under Rule of Evidence 403.[3]

<u>Article 38.37</u>

At the trial of a defendant accused of, among other things, aggravated sexual assault of a child and indecency with a child, evidence that the defendant committed a separate sex offense against another child may be admissible under Article 38.37 "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." *See* Tex. Code Crim. Proc. art. 38.37, § 2; *see also Dies v. State*, 649 S.W.3d 273, 284 (Tex. App.—Dallas 2022, pet. ref'd). Before Article 38.37 evidence may be introduced, the trial judge must conduct a hearing outside of the jury's presence to "determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." Tex. Code Crim. Proc. art. 38.37, § 2-a.

---

[3] One of Appellant's subheadings in his brief pertaining to his third issue is titled "Tex. R. Evid. 401." However, as the State correctly pointed out, the briefing under that subheading does not include any citation or argument relevant to Rule 401 and instead includes additional briefing in support of Appellant's Rule 403 sub-issue. Accordingly, we will limit our analysis of this issue to his briefed sub-issues regarding Article 38.37 and Rule 403. *See* Tex. R. App. P. 38.1(i) (requiring appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *Taylor v. State*, 558 S.W.3d 215, 218 (Tex. App.—Texarkana 2018, no pet.) (explaining that Rule 38.1 requires parties to explain why argument has substance and that appellate courts have no obligation to compose arguments for appellants); *King v. State*, 17 S.W.3d 7, 23 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (explaining that conclusory statements unsupported by authority present nothing for appellate review).

Here, the trial court held an article 38.37 hearing and ruled that the extraneous offense evidence was admissible. Appellant contends that his half-sisters' testimony did not support a finding by the jury that he committed the extraneous offenses beyond a reasonable doubt because, as he contends, the alleged extraneous offenses were not actually "offenses." More specifically, he asserts that the extraneous acts were not offenses because he and his half-sisters "were all kids" and "all within one and a half to three years of each other" and because there was no evidence of threats.

A person commits the offense of indecency with a child if that person "engages in sexual contact with [a child younger than 17 years of age] or causes the child to engage in sexual contact." Tex. Pen. Code § 21.11(a)(1). As relevant in this case, "[i]t is an affirmative defense to prosecution under [Section 21.11(a)] that the actor: (1) was not more than three years older than the victim and . . . did not use duress, force, or a threat against the victim at the time of the offense." *See id.* § 21.11(b).

We understand Appellant to contend that his sexual conduct with his half-sisters was not an offense because the above-referenced affirmative defense applied. However, Appellant has not provided any support for his contention that the State was required to disprove his affirmative defense in order for evidence of the offense to be admissible under Article 38.37. Unlike a defensive theory that negates an element of the offense, "[a] true affirmative defense is a justification or excuse independent of the elements of the offense." *Alford v. State*, 806 S.W.2d 581, 585 (Tex. App.—Dallas 1991), *aff'd*, 866 S.W.2d 619 (Tex. Crim. App. 1993) (explaining that "in the nature of a 'confession and avoidance' defense [] [e]ven if the State proves all elements of the offense beyond a reasonable doubt, the State may not punish the defendant who meets the burden of proof on an affirmative defense because commission of the offense was

25

justified"); *see Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007) (differentiating between "an affirmative defense or a defensive issue that negates one of the elements of the crime").

Despite the existence of an affirmative defense that Appellant could potentially have asserted with respect to the extraneous offense, we conclude that the trial court did not abuse its discretion by determining that the evidence likely to be admitted was adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt. *See* Tex. Code Crim. Proc. art. 38.37. *Cf. Holland v. State*, 702 S.W.3d 836, 841 (Tex. App.—Waco 2024, pet. ref'd) (stating that "if the legislature had intended for conduct that occurred while a defendant was a juvenile to be excluded from article 38.37, it could have said so but did not"). We overrule this sub-issue of his third issue.

## *Rule 403*

Although extraneous-offense evidence is admissible under subsection 2(b) of article 38.37, the trial court must still, upon proper objection or request, conduct a Rule 403 balancing test. *Hitt*, 53 S.W.3d at 706. We apply the same standard and balancing test described above. Appellant contends that the evidence was substantially outweighed by the danger of unfair prejudice because "the extraneous offenses and the present offense[s] are not comparable", and "[t]he links are too tenuous." He also contends that the extraneous offenses were based on "unsubstantiated allegations" and were "not probative to whether [he] committed the violation of the Penal Code alleged in the indictment."

*Inherent Probative Value*

Regarding Appellant's contention that the testimony was not probative because it included "unsubstantiated allegations," we note that "[t]he testimony of a child sexual abuse victim alone is sufficient to support a conviction for indecency with a child or aggravated sexual assault," *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi-Edinburg 2008, no pet.) (citing Tex. Code Crim. Proc. art. 38.07). Thus, we do not agree that the testimony lacked probative value based on any lack of a corroborating witness or other evidence.

Because evidence of prior sexual abuse of children is "'especially probative of [a defendant's] propensity to sexually assault children,' the Rule 403 balancing test normally will not favor the exclusion of evidence of the defendant's prior sexual assaults of children." *Alvarez v. State*, 491 S.W.3d 362, 371 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (quoting *Belcher v. State*, 474 S.W.3d 840, 848 (Tex. App.—Tyler 2015, no pet.)); *see Deggs*, 646 S.W.3d at 925 (explaining that "evidence of a separate sexual offense against a child admitted under Article 38.37, Section 2(b) is probative of a defendant's character or propensity to commit sexual assaults on children"). Appellant contends that the extraneous offenses had little probative value because they were "not comparable" and only tenuously linked to the charged offenses. We disagree. As the trial court observed when overruling the Rule 403 objection to this evidence, there was "the similarity of the ages of the victims, availability, and similarity of the testimony with regards to the actions taking place." The four victims were all younger family members of Appellant that were approximately six or seven years old when Appellant first started touching their "private part" at a family residence. *See Castaneda v. State*, 694 S.W.3d. 13, 24 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd) (concluding that "[t]estimony that appellant sexually assaulted two other children in a similar manner and at a similar age was highly

probative to rebut appellant's defense that Complainant fabricated her allegations"). Thus, we conclude that the first factor weighs in favor of admission.

*State's Need for Evidence*

The State's need for the extraneous-offense evidence was great. Without the evidence, the State's case would in essence have come down to the twins' word against Appellant's. *See Hammer*, 296 S.W.3d at 568 (explaining that "Rule 403 . . . should be used sparingly, especially in 'he said, she said' sexual-molestation cases that must be resolved solely on the basis of the testimony of the complainant and the defendant"). There were no corroborating eyewitnesses or physical or biological evidence of the abuse against the twins, and Appellant's principal defense was to suggest that the twins were influenced by the forensic nurse or during the forensic interview or misunderstood Appellant's innocent touching of them. The extraneous-offense testimony rebutted the defenses of fabrication through influence or misunderstanding. Other State witnesses, including the forensic interviewer and Mother, largely repeated what the twins had told them. This factor therefore weighs strongly in favor of admission. *See Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd) (determining that State's need for evidence "weighs strongly in favor of admission" because without evidence, State's case would have amounted to the complainant's word against defendant's); *Price v. State*, 594 S.W.3d 674, 681 (Tex. App.—Texarkana 2019, no pet.) (concluding that "[b]ecause there was no biological evidence and there were no third-party eyewitness to the alleged incidents, and because [defendant] challenged [victim's] credibility and memory, the State had a considerable need for the evidence").

*Tendency of Evidence to Suggest Decision on an Improper Basis*

Evidence of the assaults allegedly committed against the half-sisters may have tended to suggest a decision on an improper basis. The extraneous offenses, which spanned years and included penetrative intercourse, were more egregious than the charged offenses. *See Gigliobianco*, 210 S.W.3d at 641 (stating that evidence might encourage decision on improper basis if it arouses jury's sympathy or hostility "without regard to the logical probative force of the evidence"). *Cf. Robisheaux*, 483 S.W.3d at 220 (noting that "inherently inflammatory" nature of extraneous sexual offenses committed against children may be "ameliorated somewhat" when the extraneous allegations are "no more serious than the allegations forming the basis for the indictment"); *Dies*, 649 S.W.3d at 286 (stating "that evidence of previous child sexual abuse is inherently inflammatory by nature and, hence, can be prejudicial . . . . Yet this potential was diminished in this case by the fact that [the extraneous offense] allegations were no more serious than complainant's"). We conclude that this factor weighs in favor of exclusion.

*Tendency of Evidence to Confuse or Distract Jury*

Confusion of the issues "refers to a tendency to confuse or distract the jury from the main issues in the case." *Gigliobianco*, 210 S.W.3d at 641. Testimony concerning the extraneous offenses was straightforward, non-technical, and directly relevant to the jury's determination of guilt for the charged offense. *See* Tex. R. Evid. 401 (providing that evidence is relevant if it makes material fact more or less probable); *Caston v. State*, 549 S.W.3d 601, 612 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (concluding that "evidence that a defendant has sexually abused another child is relevant to whether the defendant sexually abused the

29

child-complainant in the charged case"). Thus, we conclude that this factor weighs in favor of admission.

*Tendency of Evidence to Be Given Undue Weight by Jury*

This factor concerns "a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Gigliobianco*, 210 S.W.3d at 641 (internal citation omitted); *see Gaytan*, 331 S.W.3d at 228. Here, the evidence was not scientific or technical and pertained to matters including victim credibility that could be easily comprehended by laypeople. *See Gaytan*, 331 S.W.3d at 228; *Deggs*, 646 S.W.3d at 927. This factor weighs in favor of admission.

*Likelihood that Evidence Will Be Too Time-Consuming or Repetitive*

This factor concerns whether "the jury would be distracted from consideration of the charged offense." *Mechler*, 153 S.W.3d at 441. As noted above, the presentation of evidence during the guilt-innocence portion of the trial covered about 335 pages and took two days. The half-sisters' testimony covered about thirty-eight pages. *Cf. Lane*, 933 S.W.2d at 520 (concluding that this factor weighed in favor of admission where extraneous-offense testimony amounted to "less than one-fifth" of trial testimony). Thus, we conclude that this factor weighs in favor of admission. *See Hernandez*, 203 S.W.3d at 481 (upholding admissibility of evidence over Rule 403 objection that took up fifty pages during two-day trial).

30

*Summary of Factors*

Based on the applicable standard of review and considering that all except one factor weighs in favor of admission, we cannot conclude that the trial court abused its discretion by overruling Appellant's Rule 403 objection. *See Brickley*, 623 S.W.3d at 83 (upholding trial court's ruling denying Rule 403 objection when majority of factors weighed in favor of admission of evidence); *Love v. State*, 706 S.W.3d 584, 615 (Tex. App.—Austin 2024, pet. ref'd) (explaining that "[a]lthough sexually-related bad acts and misconduct involving children are inherently inflammatory, the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial"). We overrule this sub-issue of Appellant's third issue.

Having overruled both sub-issues, we overrule his third issue.

### Photos of Forensic Interview

In his fourth issue on appeal, Appellant contends that the trial court erred when it admitted Exhibits 9 through 15, which are photographs extracted from the video recordings of the twins' forensic interviews. Exhibits 9 through 13 are from Older Twin's interview and Exhibits 14 and 15 are from Younger Twin's interview.[4] Appellant contends that the exhibits should have been excluded as inadmissible hearsay or, alternatively, under Rule 403.

---

[4] The State correctly points out that the contents of the two photographs contained in Exhibits 14 and 15 were also shown to the jury when the video recording of Younger Twin's forensic interview was played for them. Although defense counsel objected to that video being admitted into evidence, the State asserts in its appellate response that defense counsel abandoned the objection by saying, "put the whole thing in" after the trial court had ruled on the objection. Because the analysis for Exhibits 9 through 13 and Exhibits 14 and 15 is the same, we will assume without deciding that defense counsel did not waive appellate review of Exhibits 14 and 15 by abandoning her objection to the video exhibit in the trial court.

*Hearsay*

Appellant contends that the photographs from the forensic interviews should have been excluded as inadmissible hearsay. Hearsay, which is a statement other than one made by the declarant while testifying that is offered in evidence to prove the truth of the matter asserted, is generally inadmissible. Tex. R. Evid. 801(d), 802. Appellant contends that the photographs contain hearsay because the twins were depicted in the photographs using gestures and dolls to show where and how Appellant touched them. In determining whether nonverbal conduct may be considered hearsay, courts consider whether the conduct was an "assertion by the declarant intended to substitute for a verbal expression." *Foster v. State*, 779 S.W.2d 845, 862 (Tex. Crim. App. 1989). Part of this inquiry focuses on whether the evidence of the non-verbal conduct is being offered for the truth of the matter asserted. *See id.* at 863.

Here, the photos show the child being interviewed in a chair and the interviewer across the room in her own chair. The child gestures with their hands and with dolls while the interviewer sits across the room. The State argued to the trial court that the photographs did not constitute hearsay because they were not being offered for the truth of the matter asserted—that Appellant touched the twins in the manner demonstrated on the dolls—but rather to rebut the defense argument that the interviewer influenced or guided the twins' outcries of abuse made during the interviews. We agree. *Compare id.* (overruling hearsay issue after determining that evidence that witness made throwing motion towards stock tank where murder weapon was found was "not offered as proof of the truth of the matter asserted" that defendant committed murder with weapon but rather for purpose of explaining how weapon was recovered by police), *with Graham v. State*, 643 S.W.2d 920, 927 (Tex. Crim. App. 1981) (concluding that officer's testimony that he asked victim—who later died—who had robbed her while showing her

32

photograph of defendant and that she responded by making "a shooting motion with her hand" was inadmissible hearsay when victim's "actions and conduct was only significant as indicating her belief that [defendant] was the individual who had shot her").  Here, the photographs were not admitted for the truth of the matter asserted.  They were admitted to show the process of how the interviewer obtained the outcry statements during the interview.

We conclude that the trial court did not abuse its discretion when it admitted the photographs over defense counsel's hearsay objection.  We overrule this sub-issue of Appellant's fourth issue.

## Rule 403

Appellant contends that the photographs should have been excluded under Rule 403 because "[t]he supposed probative value of these exhibits was to illustrate that during the course of the interview, the witness worked with the alleged victims," which Appellant contends is grossly exceeded by the prejudice caused by admitting photographs of the twins showing how the abuse happened.

### Inherent Probative Value

The evidence was highly probative as rebuttal evidence against the defensive theory that the twins' allegations against Appellant were influenced or guided by their interviewer.  *See Blackwell v. State*, 193 S.W.3d 1, 18 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (concluding that evidence was highly probative for rebutting defensive theory that defendant was being framed for offense of sexual assault).  We conclude that this factor weighs in favor of admission.

*State's Need for Evidence*

The State needed the evidence to show the surrounding circumstances during the forensic interview in order to rebut the defensive theory that the interviewer had guided or influenced their allegations of sexual abuse against Appellant. *See id.* (concluding that State had strong need for evidence rebutting defensive theory that defendant was being framed for offense of sexual assault). We conclude that this factor weighs in favor of admission.

*Tendency of Evidence to Suggest Decision on an Improper Basis*

Appellant contends that "the supposed probative value of these exhibits . . . is grossly exceeded by the prejudicial value to the Defendant," because the photographs are of the twins demonstrating how the abuse occurred. Notably, "the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial. Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Pawlak*, 420 S.W.3d at 811 (internal citation omitted). To the extent that Appellant is contending that the cumulative nature of the evidence caused it to be unfairly prejudicial, we disagree that seven photographs pulled from two forensic interviews for the purpose of contradicting the defense theory that the outcries at issue in this case were guided or influenced by the interviewer to be unduly prejudicial. *Cf. Pawlak,* 420 S.W.3d at 811 (concluding that "the sheer volume of extraneous-offense evidence was unfairly prejudicial" when trial court admitted over 9,000 images of pornography, including images of children). We conclude that this factor is at least neutral.

*Tendency of Evidence to Confuse or Distract Jury*

There is no indication that this evidence had "a tendency to confuse or distract the jury from the main issues in the case." *See Gigliobianco*, 210 S.W.3d at 641. The photographs were presented to show the absence of the interviewer leading or directing the twins while they explained their allegations of abuse against Appellant. This went directly to the main issue of the case. This testimony was straightforward, non-technical, and directly relevant to the jury's determination of guilt for the charged offense. We conclude that this factor weighs in favor of admission.

*Tendency of Evidence to Be Given Undue Weight by Jury*

This factor concerns "a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Id.* (internal citation omitted); *see Gaytan*, 331 S.W.3d at 228. Here, the evidence was not scientific or technical and pertained to matters including victim credibility that could be easily comprehended by laypeople. *See Gaytan*, 331 S.W.3d at 228; *Deggs*, 646 S.W.3d at 927. We conclude that this factor weighs in favor of admission.

*Likelihood that Evidence Will Be Too Time-Consuming or Repetitive*

This factor concerns whether "the jury would be distracted from consideration of the charged offense." *Mechler*, 153 S.W.3d at 441. As noted above, the presentation of evidence during the guilt-innocence portion of the trial covered about 335 pages and took two days. The forensic interviewer's testimony regarding the complained-of photographs covered about eight pages. *Cf. Lane*, 933 S.W.2d at 520 (concluding that factor weighed in favor of

35

admission where extraneous-offense testimony amounted to "less than one-fifth" of trial testimony). Thus, we conclude that this factor weighs in favor of admission. *See Hernandez*, 203 S.W.3d at 481 (upholding admissibility of evidence over Rule 403 objection that took up fifty pages during two-day trial).

*Summary of Factors*

Based on the applicable standard of review and considering that none of the factors weigh in favor of exclusion, we cannot conclude that the trial court abused its discretion by overruling Appellant's Rule 403 objection. *See Brickley*, 623 S.W.3d at 83 (upholding trial court's ruling denying Rule 403 objection when majority of factors weighed in favor of admission of evidence). We overrule this sub-issue of Appellant's fourth issue.

Having overruled both sub-issues, we overrule his fourth issue.

## CONCLUSION

We affirm the trial courts' judgments of conviction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Ellis
  Concurring Opinion by Justice Kelly

Affirmed

Filed:  March 5, 2026

Do Not Publish

36